Submitted on record and briefs August 6, 2003, reversed and remanded for reconsideration February 4, 2004

## CRAIG NORMAN BEISWENGER,
*Petitioner,*

*v.*

## PSYCHIATRIC SECURITY REVIEW BOARD,
*Respondent.*

88-1003; A118136

84 P3d 180

Harris S. Matarazzo filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Katherine H. Waldo, Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Petitioner seeks judicial review of an order of the Psychiatric Security Review Board (PSRB or the board) denying his request for conditional release. We reverse and remand for further proceedings.

## I. STATUTORY BACKGROUND

A brief review of the relevant statutes and rules will aid in understanding the facts and arguments in proper context. ORS 161.295 provides:

"(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2) * * * [T]he terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

When a trial court enters a judgment of guilty except for insanity, the court may then order that the defendant be placed in the jurisdiction of PSRB for care and treatment, provided that the court finds, among other things, that the defendant "is affected by mental disease or defect and presents a substantial danger to others requiring commitment to a state mental hospital." ORS 161.327(1).

Pursuant to ORS 161.341(4), a person committed to a state mental hospital may petition for discharge from PSRB's jurisdiction or for conditional release:

"Any person who has been committed to a state hospital designated by the Department of Human Services for custody, care and treatment or another person acting on the person's behalf may apply to the board for an order of discharge or conditional release upon the grounds:

"(a) That the person is no longer affected by mental disease or defect;

"(b) If so affected, that the person no longer presents a substantial danger to others; or

"(c)   That the person continues to be affected by a mental disease or defect and would continue to be a danger to others without treatment, but that the person can be adequately controlled and given proper care and treatment if placed on conditional release."

Obviously, a determinative issue often is whether the petitioner is affected by a "mental disease or defect." The statutes do not define the term other than to specify what is *not* included, that is, "an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder." ORS 161.295(2). PSRB has promulgated administrative rules that define the terms "mental disease" and "mental defect" as follows:

"(4)   'Mental disease.' Mental disease is defined as any diagnosis of mental disorder which is a significant behavioral or psychological syndrome or pattern that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning and is defined in the current Diagnostic and Statistical Manual of Mental Disorders (DSM IV) of the American Psychiatric Association.

"(5)   'Mental defect.' Mental defect is defined as mental retardation, brain damage or other biological dysfunction that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning and is defined in the current Diagnostic and Statistical Manual of Mental Disorders (DSM IV) of the American Psychiatric Association."

OAR 859-010-0005(4), (5).

The DSM is a standard reference manual published by the American Psychiatric Association. The manual categorizes mental disorders on a multiaxial system; Axis I consists of clinical disorders, Axis II of personality disorders and mental retardation, Axis III of general medical conditions, Axis IV of psychosocial and environmental problems, and Axis V of the global assessment of functioning.

Since the publication of the first edition in 1952, the manual has been substantially revised over the years, and with those revisions have come reassessments of precisely

what constitutes a mental disorder. A second edition was published in 1968, followed by a third edition in 1979. Revision of the DSM-III began almost immediately after that, and a DSM-III-R was published in 1987. The current edition is the DSM-IV, published in 1994.

## II.  FACTUAL BACKGROUND

The relevant facts are not disputed. In 1988, petitioner was found guilty except for insanity, ORS 161.295, of kidnapping in the second degree, ORS 163.225, menacing, ORS 163.190, and unlawful use of a weapon, ORS 166.220. Petitioner was diagnosed at that time as suffering from "incipient paranoid schizophrenia" and "chronic residual schizophrenia." The trial court ordered that petitioner be placed under the jurisdiction of PSRB for a maximum period of 16 years and that he be conditionally released. ORS 161.327(2)(b).

In September 1989, PSRB revoked petitioner's conditional release. At the time of petitioner's admission to the state hospital, his diagnosis under the pertinent DSM was that he suffered from an Axis I disorder, chronic paranoid schizophrenia. In May 1991, a psychologist determined that petitioner "fits the profile of a character disordered person who has developed a very serious paraphili[a]c coercive disorder." In 1992, a psychiatrist diagnosed petitioner as suffering from paraphilia not otherwise specified, psychoactive substance abuse, and schizoid personality disorder.

In June 1996, a psychologist diagnosed petitioner as suffering from schizophrenia, paranoid type, in remission. In September 1996, a psychiatrist determined that petitioner was suffering from the Axis I diagnoses of psychoactive substance abuse, alcohol abuse, and cannabis abuse, and the Axis II diagnosis of schizoid personality disorder. At a hearing in October 1996, petitioner stipulated that he was affected by a mental disease or defect; his commitment to the state hospital was continued pending availability of a suitable plan for conditional release. In July 1997, petitioner was diagnosed as suffering from the Axis I disorders of alcohol abuse and cannabis abuse and the Axis II disorder of schizoid personality disorder. In October 1997, petitioner was conditionally released. In 1999, his conditional release was again

revoked. In October 2000, petitioner was diagnosed as suffering from the Axis I disorders of paranoid schizophrenia, in remission; alcohol abuse, in remission; and cannabis abuse, in remission. In April 2001, petitioner received the Axis I diagnoses of schizophrenia, paranoid type, in remission; and alcohol abuse, in remission. A "progress note update" in May 2001 assigned petitioner the Axis I diagnosis of cannabis abuse in remission and the Axis II diagnosis of "mixed personality disorder, with schizoid and paranoid themes."

In January 2002, petitioner applied to the board for conditional release. ORS 161.341(4). In March 2002, a psychiatrist prepared a progress note update in which he diagnosed petitioner as suffering from the Axis I disorders of paraphilia not otherwise specified, alcohol abuse, cocaine abuse, cannabis abuse, and amphetamine abuse, and with the Axis II disorder of personality disorder with obsessive-compulsive features. In April 2002, the board held a hearing for the purpose of determining whether petitioner should be conditionally released. Evidence at the hearing included the testimony of a psychiatrist and records pertaining to petitioner's custody and treatment. At the close of the hearing, petitioner argued that he was entitled to release because he was not currently suffering from a mental disease or defect. According to petitioner, his current drug- and alcohol-related diagnoses and his sexual disorder diagnosis of paraphilia demonstrated that he suffered only from "personality disorders," which by definition are not mental diseases or defects within the meaning of the relevant statutes.

The board found as fact that petitioner was affected by a mental disease or defect, that he continued to present a substantial danger to others, and that he could not adequately be treated or controlled in the community if conditionally released. The board cited ORS 161.346(1)(c) as authority; it did not cite any administrative rule, nor did it expressly state which edition of the DSM, if any, it applied in making its determinations. The board continued petitioner's commitment to the state hospital.

### III. DISPOSITION OF THE MERITS

On judicial review, petitioner argues that PSRB erred in concluding that he suffers from a mental disease or

defect within the meaning of ORS 161.295(1). He argues that, because the term is not defined in the statute and otherwise has no settled meaning, it is appropriate to turn to the legislative history of the statute, which he contends clearly demonstrates that conditions such as sexual conduct disorders, alcohol dependence, and drug dependence were intended to be classified as personality disorders, not mental diseases or defects.

The state contends that the statute is clear on its face and that resort to legislative history is unnecessary. It argues that, in *Mueller v. PSRB*, 325 Or 332, 937 P2d 1028 (1997), the Supreme Court concluded that whether a given condition is a "mental disease or defect" may be determined by reference to PSRB rules and to the edition of the DSM in effect at the time that those rules were adopted. The state further argues that, under PSRB's current rules, the relevant edition is the DSM-IV and, in that edition, each of petitioner's diagnosed conditions is a mental disease or defect.

Petitioner in turn argues that, to the extent that PSRB is relying on its own rules and on the DMS, those rules are clearly at odds with the intended meaning of the statute and that, at the very least, the board cannot define statutory terms by reference to editions of professional publications that did not even exist at the time the statute was enacted.

The meanings of the terms "mental disease or defect" and "personality disorder" pose questions of statutory construction. When a question of statutory construction involves an administrative agency's construction, the weight that we give to that construction depends on the nature of the statutory term. *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 353-54, 15 P3d 29 (2000). If, as in this case, the term is "inexact" in nature, we review the agency's construction as a matter of law, in accordance with the interpretive principles described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), that is, we attempt to determine the intended meaning of the statute by reference to its text in context and, if necessary, its legislative history and other aids to construction. *Coast Security Mortgage Corp.*, 331 Or at 353-55.

## A. *Textual analysis*

■■    At the first level of statutory construction, we examine —among other things—the wording of the statute in context and any prior judicial constructions of it. *Michels v. Hodges*, 326 Or 538, 544-45, 956 P2d 184 (1998). Our objective is to determine whether the legislature unambiguously expressed the intended meaning of the terms in dispute. *PGE*, 317 Or at 611. A statutory term is "ambiguous" if more than one interpretation is not "wholly implausible." *Owens v. MVD*, 319 Or 259, 268, 875 P2d 463 (1994). If the term is ambiguous, we must resort to legislative history to determine which among the competing interpretations the legislature intended. *Id.*

In this case, as we have noted, the statutes do not expressly define the term "mental disease or defect." In common parlance, a mental disease is "a disease characterized esp. by mental symptoms : mental disorder : INSANITY." *Webster's Third New Int'l Dictionary* 1411 (unabridged ed 1993). "Defect" is similarly broadly defined as "want or absence of something necessary for completeness, perfection, or adequacy in form or function : DEFICIENCY, WEAKNESS." *Id.* at 591. Thus, the phrase "mental disease or defect" could refer to virtually any infirmity of a nonphysical nature, including sexual misconduct disorders and alcohol and drug dependence.

ORS 161.295, however, explicitly imposes some limits on the term by describing what is *not* included, namely, "an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder." ORS 161.295(2). The problem is that the statute does not define what constitutes a "personality disorder." The ordinary meaning of the term is a "psychopathological condition or group of conditions in which an individual's entire life pattern is considered deviant or nonadaptive." *Webster's* at 1687. In light of that definition, it is plausible that the legislature intended such deviant or nonadaptive life patterns as sexual misconduct disorders and alcohol and drug dependence to be regarded as "personality disorders" within the meaning of the statute and, as a result, to be excluded from the meaning of "mental disease or defect."

The term "personality disorder" also is a term of art within the mental health community. According to DSM-III—the edition in effect at the time that the relevant provisions of ORS 161.295 were enacted—the term refers to a condition that typically manifests no later than adolescence, continues throughout most of a person's adult life, and involves "enduring patterns of perceiving, relating to, and thinking about the environment and oneself" that "are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress." Again, under that definition, it is plausible that the legislature could have intended sexual misconduct disorders and alcohol and drug dependency to be "personality disorders," and not "mental disease[s] or defect[s]" within the meaning of the statute.

■ In short, the statutory references to "mental disease or defect" and "personality disorder" are ambiguous. Resort to legislative history therefore is necessary.

The state insists that resort to legislative history is inappropriate because, in *Mueller*, the Supreme Court already has determined "at the first level" of analysis that whether a disorder is a "personality disorder" that does not constitute a "mental disease or defect" within the meaning of ORS 161.295 is determined merely by reference to the current DSM. The state reads more into *Mueller* than the opinion fairly may bear, however.

In *Mueller*, the issue was whether the petitioner, who was diagnosed with "organic personality disorder," suffered a "mental disease or defect" within the meaning of ORS 161.295. The petitioner argued that the condition was instead a "personality disorder." *Mueller*, 325 Or at 338. The court noted that the term "personality disorder" is a term of art within the mental health community and that the court previously had determined that the DSM-III was "helpful" in determining whether a given condition constitutes a personality disorder. *Id.* at 339-40. The court also noted that PSRB had promulgated rules—the validity of which no one contested—that incorporated by reference the DSM-III and its specifications of what constitute "personality disorders." The court observed that the disorder at issue in that case—

denominated in DSM-III as "organic personality syndrome—was classified in that edition as an Axis I disorder, not a personality disorder. Therefore, the court held that, under the applicable PSRB rules, the petitioner's condition was a "mental disease or defect." *Id.* at 341-42.

To begin with, *Mueller* cannot be read as a declaration that the meaning of ORS 161.295 is plain from the text of the statute alone or that, in future cases, it is inappropriate to consult the statute's enactment history to determine whether the legislature intended particular conditions to be regarded as "personality disorders." We have searched the opinion in vain for any such declarations. The court did say that the then-current version of the DSM was "helpful." The court did not say that that edition—much less editions that had not yet been published—would be dispositive.

*Mueller* was, of course, also based on the court's application of PSRB's administrative rule, which the petitioner had not contested. In contrast, in this case, although PSRB also relies—at least on appeal—on a rule that incorporates by reference the current edition of the DSM, petitioner has put the validity of that rule directly in issue, arguing that the reference to the DSM-IV is unlawful.

Although the state does not mention it, we acknowledge that there is one opinion that purports to foreclose resort to legislative history: *Hanson v. PSRB*, 156 Or App 198, 965 P2d 1051 (1998), *rev'd and rem'd on other grounds*, 331 Or 626, 19 P3d 350 (2001). In that case, a plurality of this court, sitting en banc, concluded that PSRB had correctly concluded that alcohol abuse was not a "personality disorder" because DSM-IV, the edition in effect when the board's most current rules were adopted, did not list the condition as a personality disorder. *Id.* at 203-04. The plurality expressly rejected the suggestion that it should resort to the legislative history that, according to the dissent in that case, plainly demonstrated that the legislature intended the condition to be regarded as a "personality disorder" and not as a "mental disease or defect" within the meaning of the statute. *Id.* at 203 n 4.

There is also a per curiam decision that relies on the reasoning of the lead opinion in *Hanson*. *Rios v. PSRB*, 176

Or App 252, 30 P3d 1227 (2001). The lead opinion in *Hanson*, of course, is not precedent. The per curiam opinion in *Rios* is. However, for the reasons we have stated, we conclude that *Rios* was incorrectly decided. We therefore turn to the enactment history of ORS 161.295.

## B. *Legislative history*

ORS 161.295 originated as House Bill (HB) 2075 during the 1983 legislative session. The bill was the product of an interim legislative committee that focused on public concerns with the so-called "insanity defense" in criminal cases. At the first of the many hearings on the bill, the witnesses who testified in support urged that the determinative term—"mental disease or defect"—*not* be defined solely in psychiatric terms, but rather in legal or multidisciplinary terms. The Executive Director of PSRB, for example, testified that the American Psychiatric Association had released a report on the "insanity defense" in which it recommended that the "decision to release" a person under such a scheme "not be made solely by psychiatrists or solely on the basis of psychiatric testimony regarding the person's mental condition." Minutes, House Committee on Judiciary, HB 2075, Apr 6, 1983, 2 (statement of Felicia Gniewosz). Similarly, a professor of psychiatry at Oregon Health Sciences University (OHSU) submitted written testimony stating that he "view[ed] the insanity defense as a legal issue. Psychiatrists and physicians did not invent the insanity defense. It came from the law and serves legal ends." Minutes, House Committee on Judiciary, HB 2075, Apr 27, 1983, Ex E (statement of Professor Joseph D. Bloom, M.D.).

The original version of the bill did not exclude "personality disorders" from the "mental disease[s] or defect[s]" that would be subject to a defense of guilty except for insanity. At an early hearing on the bill, the Executive Director of PSRB suggested that the bill should address that issue:

> "The legislature should take a position to either include or exclude 'personality disorders' from the definition [of 'mental disease or defect']. It should be noted that personality disorders include the following diagnoses: antisocial, inadequate, passive-aggressive, sexual conduct disorders, drug dependent, alcohol dependent and paranoid."

Minutes, House Committee on Judiciary, HB 2075, Apr 27, 1983, Ex D (statement of Felicia Gniewosz).

At the same hearing, the chair of PSRB testified that the board supported the exclusion of "personality disorders" from the definition of "mental disease or defect." She explained to the House Judiciary Committee that "personality disorders" include child molestation, other sex offenses, and persons "suffering from a drug-induced syndrome." Tape Recording, House Committee on Judiciary, HB 2075, Apr 27, 1983, Tape 270, Side A (statement of Judy Snyder). She added as a further example of a "personality disorder":

> "[P]eople who have an alcohol problem and who maybe stabbed someone while they were in an alcoholic stupor and they're put under our jurisdiction. * * * The problem the board has is that kind of person can be very dangerous if they drink alcohol but the doctors will testify that's not a mental illness, they don't have a mental illness[.]"

*Id.* at Tape 269, Side B.

The subject of defining the conditions that constitute a "personality disorder" arose again at a later hearing. During the course of further testimony from the Executive Director of PSRB, Representative Hill asked whether the distinguishing characteristic of a "personality disorder" is the individual's self control. The Executive Director replied that some individuals can control their disorders, while others cannot. She explained that "the perfect example would be that one of the personality disorders would be somebody that's alcohol or drug dependent." Tape Recording, House Committee on Judiciary, HB 2075, May 13, 1983, Tape 324, Side A (statement of Felicia Gniewosz).

It was at that point that the current wording of the statute was first proposed. Representative Courtney asked Jeffrey Rogers, the chair of the legislative interim task force that had drafted the bill, to propose wording that would accomplish the exclusion of "personality disorders" from the statutory definition of "mental disease or defect." Rogers responded with the wording that is, in substance, the current law. The wording was adopted by the House Judiciary Committee without objection. Tape Recording, House Committee on Judiciary, HB 2075, May 13, 1983, Tape 324, Side A.

The House Judiciary Committee ultimately approved the bill, including the exclusion for "personality disorders." Interestingly, in the staff measure analysis prepared for the benefit of the committee members, the effect of the bill was summarized in the following terms:

> "The bill as amended further limits the scope of mental diseases or defects for which a person may be found, under present law, 'not responsible.' Existing law excludes abnormalities manifested only by repeated criminal or otherwise antisocial conduct. The bill would exclude, in addition, any abnormality which constitutes solely a personality disorder, which includes such diagnoses as sexual conduct disorders, drug dependent and alcohol dependent."

Staff Measure Analysis, House Committee on Judiciary, HB 2075 (1983).

The bill moved to the floor of the House, where the floor manager, Representative Courtney, explained that it contained a "personality exclusion" that accomplished a narrowing of the definition of "mental disease or defect." Quoting from a letter from PSRB's Executive Director to the House Judiciary Committee, he explained:

> "Right now if a person has what is considered a personality disorder, by that I mean what they call 'anti-social, inadequate, passive-aggressive, sexual conduct disorders, drug dependent, alcohol dependent, or paranoid,' if they fit into that personality disorder category they're able to claim that they have a mental disease or defect. We now no longer, with this piece of legislation, will allow an individual to say that I have a mental disease or defect because I have a personality disorder."

House Floor Debate, HB 2075, June 16, 1983, Reel 19, Track I (Rep Peter Courtney).

After passage by the House, the bill was referred to the Senate Judiciary Committee. At the first hearing on the bill, Representative Courtney introduced it to the committee and explained that it "would remove personality disorders as a category that could be relied on for use of the insanity plea." Tape Recording, Senate Committee on Judiciary, HB 2075, June 29, 1983, Tape 234, Side A (Rep Peter Courtney). A

"personality disorder," he explained, included such conditions as "anti-social, inadequate, passive-aggressive, sexual conduct disorders, drug dependent, alcohol dependent, paranoid, etc." *Id.*

Rogers also testified before the Senate Judiciary Committee. He explained the findings of a recently completed study that he and two professors from OHSU had completed concerning the insanity defense in Oregon. The report explicitly categorized alcohol and drug dependency as "personality disorders." Senate Judiciary Committee, HB 2075, June 29, 1983, Unmarked Exhibit ("Oregon's New Insanity Defense System: A Review of the First Five Years—1978-1982").

The Senate Judiciary Committee, concerned that the concept of "personality disorder" was too difficult to define, deleted the exclusion from the bill, and the Senate approved the bill as amended.

The bill then moved to a conference committee. The first topic of discussion was the deletion of the "personality disorder" exclusion. Representative Courtney explained that he was satisfied that the term was practicable. He referred to the Rogers insanity defense study and its list of diagnoses— including, among other things, drug and alcohol dependency —that qualified as "personality disorders." Tape Recording, Conference Committee, HB 2075, July 13, 1983, Tape 550, Side A. The committee ultimately agreed to restore the "personality disorder" exclusion. The staff measure analysis of the final version of the bill explained that, as amended, the bill "would exclude * * * any abnormality which constitutes solely a personality disorder, which includes such diagnoses as sexual conduct disorders, drug dependent and alcohol dependent." Staff Measure Analysis, House Committee, HB 2075, 1983. As amended by the conference committee, the bill was passed by both houses and signed into law.

Several things are worth noting about the legislative history. First, although legislative history frequently is sparse and equivocal, in this case, it is anything but that. From the first hearing before the House Judiciary Committee, to the House floor debates, to the Senate hearings and the conference committee negotiations, the legislative history

consistently and pervasively reflects an understanding that the statutory term "personality disorder" includes, among other things, sexual conduct disorders, alcohol dependency, and drug dependency.

Second, the reason for the legislature's concern with defining the term "personality disorder" also comes through rather clearly in the records of the enactment history. The "mental disease[s] or defect[s]" to which the statute refers are important not just for purposes of determining whether an individual who is subject to the jurisdiction of the PSRB may be released; they are also critical to determining whether a defendant may, in the first instance, avoid responsibility for the commission of a criminal act by reason of such a mental condition. Legislators repeatedly expressed concern that criminal defendants not be permitted to avoid criminal responsibility and incarceration merely by asserting that they suffered from some "mental disease or defect," as broadly defined. As Representative Courtney explained at several key junctures during the enactment process, the legislature believed it was necessary to provide an exclusion for "personality disorders" so that criminal defendants could not avail themselves of an insanity defense on the basis of such conditions as sexual conduct disorders, alcohol dependency, and drug dependency. In other words, as Courtney explained, by narrowly defining "mental disease or defect," the legislature intended to make the insanity defense less broadly available to criminal defendants. *See, e.g.*, House Floor Debate, HB 2075, June 16, 1983, Reel 19, Track I ("We now no longer, with this piece of legislation, will allow an individual to say that I have a mental disease or defect because I have a personality disorder.").

The state insists that, at best, the legislative history contains "an unexamined conflict," in that several witnesses "referred to the DSM" in their testimony while at the same time specifically referring to sexual conduct disorders and substance dependency as personality disorders. According to the state, the conflict exists in the fact that the DSM-III did not classify those disorders as "personality disorders" at the time. Thus, the state contends, the witnesses essentially misled the legislature. Unfortunately, the state did not provide citations to the legislative history for its assertion. Nor have we identified such references in the written record.

■ In any event, the existence of such a "mistake" strikes us as entirely beside the point. The objective of resorting to the legislative history is to ascertain what the legislature most likely would have understood as to the purpose and meaning of the wording of its enactments. *PGE*, 317 Or at 610-12. Whether or not witnesses, in fact, were "mistaken" in indicating to the legislature that the mental health profession currently classified certain conditions as "personality disorders," the fact remains that the legislature clearly enacted the legislation based on that understanding.

Moreover, the "conflict" that the state identifies exists only if it is assumed from the outset that the legislature intended the DSM to have some sort of determinative effect. The state has cited nothing in the legislative history to suggest that. To the contrary, as we have noted, from the very beginning of the enactment process, the legislative history demonstrates that the legislature wished the determination of whether an individual suffers a "mental disease or defect" *not* to be exclusively within the domain of psychiatric or psychological professionals.

C. *Relevant maxims of construction*

■■ Even assuming, for the sake of argument, that the state is correct that the legislative history is equivocal, that would not end our analysis. We would be required to resort to relevant maxims of statutory construction to resolve the persistent ambiguity. *PGE*, 317 Or at 611-12. One of the maxims on which the Supreme Court often relies is that, in the absence of other clear indications of legislative intent, courts should attempt to reconstruct what the legislature would have done had it confronted the issue at hand. *See, e.g., Windsor v. Judd*, 321 Or 379, 387, 898 P2d 761 (1995). The court accomplishes that by selecting the construction that most completely effectuates the general policies reflected by the available indicia of legislative intent. *Id.*

■ In this case, that task is not especially difficult. As we have noted, the legislature clearly stated that the general policy motivating its creation of the "personality disorder" exclusion was that the statutory term "mental disease or defect" be narrowly defined to limit the extent to which criminal defendants can avail themselves of the insanity defense. The state's proposed construction would run afoul of that

general policy. Specifically, giving the term "mental disease or defect" the broad reading that the state suggests would expand the availability of the insanity defense to cover precisely those individuals whom the legislature explicitly intended to exclude.

██ ██ We therefore conclude that the legislature intended the reference to "personality disorder" in ORS 161.295(2) to include sexual conduct disorders, alcohol dependency, and drug dependency and that, as a result, those disorders do not constitute a "mental disease or defect" within the meaning of ORS 161.295(1). The only conditions on which the state relies in this case for its assertion that petitioner was affected by a "mental disease or defect" are paraphilia—a sexual conduct disorder—and alcohol and drug dependency. Those conditions are not "mental disease[s] or defect[s]" within the meaning of ORS 161.295. It necessarily follows that PSRB erred in reaching a contrary conclusion.

## D.  *Judicial estoppel*

The state insists that, even if we are correct in our reading of ORS 161.295, petitioner in this case should be estopped from asserting the "personality disorder" exclusion. According to the state, by stipulating at his criminal trial that he was affected by a "mental disease or defect," petitioner is now precluded from asserting "that those same disorders cannot support jurisdiction." The state cites in support of its argument the concurring opinion in *Hanson*, 156 Or App at 207-09 (De Muniz, J., concurring).

In *Hanson*, the petitioner had asserted a mental disease defense based on his chronic alcoholism. The trial court accepted that argument. Less than a year later, he sought discharge from PSRB's jurisdiction on the ground that alcoholism is not a "mental disease or defect" within the meaning of the statute. The concurrence suggested that the petitioner's "reliance on the defense that his alcohol-induced delusions constituted a mental disease under ORS 161.295 precludes him now from arguing that his alcohol abuse is not a mental disease under" the same statute. *Id.* at 209 (De Muniz, J., concurring).

■ In this case, the facts are quite different. Petitioner does not now suffer the same disorder that he suffered at the time of his criminal trial. As we have noted, petitioner originally was placed under the jurisdiction of PSRB because of his diagnoses of incipient paranoid schizophrenia and chronic residual schizophrenia. Those conditions no longer pertain, and the only ones that do are paraphilia and alcohol and drug dependency.

■ Thus, even assuming the correctness of the concurrence in *Hanson*, petitioner is not estopped in this case from asserting that he suffers from a "personality disorder" within the meaning of the statute. Judicial estoppel applies only when a party assumes a position in one judicial proceeding that is inconsistent with the position that the party previously—and successfully—took in a different judicial proceeding. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609-10, 892 P2d 683 (1995). That is not the case here.

Reversed and remanded for reconsideration.