DeVORE, J., *95 Defendant appeals a judgment of conviction for murder, raising two assignments of error. Defendant first argues that the trial court erred in instructing the jury that defendant's drug-induced psychosis was not a "mental disease or defect" under ORS 161.295 and ORS 161.300.[1] Defendant also argues that the court erred in requiring defendant to pay $3,627.30 in extradition costs. For the reasons that follow, we conclude that the trial court did not err in instructing the jury that defendant's transitory, drug-induced psychosis was not a "mental disease or defect" under ORS 161.295 and ORS 161.300.[2] We do agree, however, that, absent a finding of an ability to pay, the court erred in ordering defendant to pay $3,627.30 in extradition costs. Accordingly, we reverse the portion of the judgment requiring defendant to pay extradition costs, and otherwise affirm. *470 TRIAL
Defendant and his girlfriend, Perry, had come to Oregon from Mississippi. They lived in a motel room while here for seasonal construction employment. During their time in Oregon, defendant and Perry used methamphetamine and marijuana frequently.
The events leading to Perry's death were recounted by defendant at trial and in a recorded statement that he gave to a detective and that was played to the jury. Around 4:00 a.m. on November 23, 2014, Perry returned to the motel room after an evening out with friends. She and defendant used methamphetamine and marijuana and engaged in sexual activity. During intercourse, defendant perceived Perry's face to change, looking "evil." He believed that she was a "demon." When his leg and hip began to hurt, they stopped having sex. Defendant believed that she was responsible *96 for his hip pain. He made a phone call to his stepfather, expressing concern about his relationship with God and his relationship with Perry. He hung up and told Perry that he "was a child of God" and that he did not fear her and that she should not fear him. Defendant perceived Perry's face to turn evil again, and he said that he felt the presence of evil. A conflict ensued. As he described it,
"[s]omehow or another we started fighting. Then I got up and then we started choking each other. And then every time that I would call out to God to give me the strength to kill her, she got weaker, and I got stronger. And then every time like I would doubt myself that God wasn't there for me, she would overcome me, but I killed her. Okay? And I just felt, I don't know, like it was the right thing to do."
Immediately after killing Perry, defendant drove to Mississippi. During the drive, defendant claimed that he heard Perry's voice through the radio, and he thought that the radio stations were talking to him. Days later, defendant confessed the murder to detectives and was arrested. The state charged defendant with murder, ORS 163.115, and unlawful possession of methamphetamine, ORS 475.894.
Two experts testified at trial, and their diagnoses were generally in agreement. At defendant's behest, Jerry Larsen, a psychiatrist, had examined defendant and diagnosed him with cannabis abuse, amphetamine dependence, and "probable amphetamine-induced psychotic disorder with delusions and hallucinations" at the time of the killing. He explained that a diagnosis of amphetamine-induced psychosis, also referred to as drug-induced psychosis, is made, in part, by "the presence of hallucinations or delusions" that the individual believes to be real. Larsen contrasted that diagnosis with a diagnosis of drug dependence, which is characterized by physical or emotional withdrawal symptoms. He said that the "difficulty with [a drug-induced psychosis ] is that the symptoms look like schizophrenia. The difference is that schizophrenic illnesses are lifelong, they don't get better but they can be controlled. A drug-induced psychosis clears after a period of time." Larsen testified that defendant was not exhibiting signs of psychosis or mental disorder at the time that Larsen evaluated him.
*97 Larsen's examination revealed that, in 2009 and 2010 when defendant was not incarcerated, he used methamphetamine daily, and, by 2014, he had "doubled his intake of methamphetamine." Defendant told Larsen that he had been using a quarter to half a gram of methamphetamine every day in Oregon. In the 12 hours leading up to Perry's death, he consumed a gram of methamphetamine-a "high dose." Larsen concluded that defendant's drug-induced psychosis was caused by his long-term methamphetamine use.
Eric Johnson, a clinical psychologist hired by the state, had also evaluated defendant and agreed with Larsen's conclusions. Johnson considered that defendant had a history of chronic substance abuse with an early onset. Defendant told Johnson that he had not slept for over a week prior to the killing, that he had been using methamphetamine continuously during that time, and that he was using "a lot of meth immediately leading up to her death."
Johnson addressed whether defendant exhibited any signs of an underlying mental disorder or continuing psychosis independent *471 of the use of drugs. He explained that, as defendant drove back to Mississippi, the psychotic effects that he was originally experiencing, such as voices speaking to him from the radio, dissipated as the "meth was beginning to wear off and the further he got," which was "[c]onsistent with methamphetamine withdrawal." To determine whether there was "evidence of ongoing mental or emotional problems," Johnson reviewed records of defendant's medical history as well as mental health records from the jail after defendant was taken into custody. Johnson said that those mental health records were "unremarkable."[3] Johnson concluded from his evaluation that defendant was suffering from "a methamphetamine-induced psychotic disorder based upon his voluntary use of that drug." Johnson elaborated, testifying that defendant was delusional and hallucinating at the time of the killing but that there was *98 "no evidence" of "any lingering psychosis" or long-term mental disorder.
Later in his testimony, Johnson said that, with a drug-induced psychosis, it is theoretically possible that "some people who will experience some type of psychotic phenomenon that doesn't appear to fully resolve" and "can last a long time." But Johnson clarified that he and Larsen both concluded that, in this case, there was "no evidence whatsoever" that defendant had an "actual defect of the brain" from long-term drug use and that defendant did not "exhibit any evidence of any mental disorder other than that which was induced by his voluntary intoxication by methamphetamine." Johnson agreed that drug-induced psychosis is a "transient disorder." The psychosis"[s]tarts and stops when you use [the drug]," and, "when you remove the agent, the drug, the psychosis is no longer there." He concluded that "there's no evidence * * * to indicate that [defendant] has a psychotic disorder outside of his use of methamphetamine."[4]
Defendant tried his case on the theory that he did not act with the requisite culpable mental state. He argued that he lacked the ability to act intentionally based in part on mental disease or defect under ORS 161.300. He also asserted the affirmative defense of insanity under ORS 161.295. Among others, the trial court gave jury instructions for voluntary intoxication under ORS 161.125, diminished capacity under ORS 161.300, and guilty except for insanity under ORS 161.295. Over defendant's objections, however, the trial court instructed the jury that "[d]rug use, drug dependence, and drug-induced psychoses are not mental diseases or defects as the term mental disease or defect is used in these instructions." The jury convicted defendant as charged.
MENTAL DISEASE OR DEFECT
On appeal, defendant argues that the trial court erred in instructing the jury that defendant's drug-induced psychosis was not a "mental disease or defect" under *99 ORS 161.295 and ORS 161.300. Defendant does not challenge the part of the instruction that says that drug use and drug dependence are not mental diseases or defects. See Tharp v. PSRB , 338 Or. 413, 420, 110 P.3d 103 (2005) (substance abuse held a personality disorder and not a mental disease or defect). However, according to defendant, a drug-induced psychosis should be included within the meaning of ORS 161.295, as a matter of law. Defendant argues that "insanity brought about by intoxication ha[s] long been considered a qualifying mental disease or defect under previous iterations of Oregon's insanity defense." Defendant contends that amendments to ORS 161.295 in 1983 did not affect that principle.
The state counters that the trial court correctly instructed the jury that drug-induced psychosis is not a "mental disease or *472 defect" under ORS 161.295 and ORS 161.300. The state relies on the legislative history of ORS 161.295, particularly as reviewed in a pair of subsequent cases.
We review for legal error whether a trial court's jury instruction correctly states the law. State v. Sandoval , 342 Or. 506, 510-11, 156 P.3d 60 (2007). To determine whether the legislature intended to include the diagnosis of drug-induced psychosis in this case within the definition of "mental disease or defect" in ORS 161.295 and ORS 161.300, we consider the text, context, and legislative history of the relevant statutes. State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) ; State v. Walker , 356 Or. 4, 13, 333 P.3d 316 (2014). Based on those sources, we conclude, on this record, that defendant's transitory, drug-induced psychosis is not a "mental disease or defect" as contemplated by the legislature for purposes of ORS 161.295 and ORS 161.300.
Text and context begins with the statute providing for a verdict of guilty except for insanity. That statute, ORS 161.295, provides:
"(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.
*100 "(2) As used in chapter 743, Oregon Laws 1971, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."
The related statute, ORS 161.300, provides that "[e]vidence that the actor suffered from a mental disease or defect is admissible whenever it is relevant to the issue of whether the actor did or did not have the intent which is an element of the crime." Both statutes use the phrase "mental disease or defect," and the meaning of the phrase is the same in both ORS 161.295 and ORS 161.300. See Tharp , 338 Or. at 421-22, 110 P.3d 103 (construing the phrase in the same way in separate statutes).
As the parties recognize, the text of ORS 161.295 does not define "mental disease or defect," other than to provide that it does not include an "abnormality manifested only by repeated criminal or otherwise antisocial conduct" or an "abnormality constituting solely a personality disorder." Consequently, the parties focus on whether defendant's drug-induced psychosis constitutes solely a "personality disorder" as the legislature used that term in ORS 161.295(2). The legislature has not further defined the term "personality disorder," but, after the amendment, subsequent cases have construed it. See Tharp , 338 Or. at 430, 110 P.3d 103 ; Beiswenger v. PSRB , 192 Or.App. 38, 54, 84 P.3d 180, rev. dismissed , 337 Or. 247, 95 P.3d 728 (2004) ; see also Ashcroft v. PSRB , 338 Or. 448, 452, 111 P.3d 1117 (2005) ("[A]lcohol dependence, like the drug and substance dependence that we discussed in Tharp , is a 'personality disorder.' ").
In Tharp , the Supreme Court considered whether a diagnosis of substance dependency constituted a "personality disorder" within the meaning of ORS 161.295 and, thus, is something that is expressly excluded from a "mental disease or defect" under that statute. The court recognized that the terms "mental disease or defect" and "personality disorder" are not words of common usage. Rather, they are "terms of art that are used in the context of professional disciplines such as psychiatry and psychology, although here, of course, their application has specific legal consequences." 338 Or. at 423, 110 P.3d 103. The court acknowledged that the Diagnostic and *101 Statistical Manual of Mental Disorders (DSM) is "an important source for interpreting statutory terms related to mental illness," but the court rejected an invitation to adopt the DSM's definition of "personality disorder" to address whether "substance dependency" constituted a "mental disease or defect" for purposes of the insanity statute. Id . at 423-25, 110 P.3d 103. Instead, the court found the legislative history of ORS 161.295 persuasive when concluding that the legislature intended to exclude from the definition of "mental disease or defect" a diagnosis of substance dependency as a "personality disorder." Id. at 430, 110 P.3d 103. *473 To review the legislative history, Tharp quoted the legislative account detailed in Beiswenger . Because that account can be neither improved nor paraphrased, we quote that account at length:
" ORS 161.295 originated as House Bill (HB) 2075 during the 1983 legislative session. The bill was the product of an interim legislative committee that focused on public concerns with the so-called 'insanity defense' in criminal cases. At the first of the many hearings on the bill, the witnesses who testified in support urged that the determinative term-'mental disease or defect'-not be defined solely in psychiatric terms, but rather in legal or multidisciplinary terms. The Executive Director of PSRB [Psychiatric Security Review Board (PSRB) ], for example, testified that the American Psychiatric Association had released a report on the 'insanity defense' in which it recommended that the 'decision to release' a person under such a scheme 'not be made solely by psychiatrists or solely on the basis of psychiatric testimony regarding the person's mental condition.' Minutes, House Committee on Judiciary, HB 2075, Apr. 6, 1983, 2 (statement of Felicia Gniewosz). Similarly, a professor of psychiatry at Oregon Health Sciences University (OHSU) submitted written testimony stating that he 'view[ed] the insanity defense as a legal issue. Psychiatrists and physicians did not invent the insanity defense. It came from the law and serves legal ends.' Minutes, House Committee on Judiciary, HB 2075, Apr. 27, 1983, Ex. E (statement of Professor Joseph D. Bloom, M.D.).
"The original version of the bill did not exclude 'personality disorders' from the 'mental disease[s] or defect[s]'
*102 that would be subject to a defense of guilty except for insanity. At an early hearing on the bill, the Executive Director of PSRB suggested that the bill should address that issue:
" 'The legislature should take a position to either include or exclude "personality disorders" from the definition [of "mental disease or defect"]. It should be noted that personality disorders include the following diagnoses: antisocial, inadequate, passive-aggressive, sexual conduct disorders, drug dependent, alcohol dependent and paranoid.'
"Minutes, House Committee on Judiciary, HB 2075, Apr. 27, 1983, Ex. D (statement of Felicia Gniewosz).
"At the same hearing, the chair of PSRB testified that the board supported the exclusion of 'personality disorders' from the definition of 'mental disease or defect.' She explained to the House Judiciary Committee that 'personality disorders' include child molestation, other sex offenses, and persons 'suffering from a drug-induced syndrome. ' Tape Recording, House Committee on Judiciary, HB 2075, Apr. 27, 1983, Tape 270, Side A (statement of Judy Snyder). She added as a further example of a 'personality disorder':
" '[P]eople who have an alcohol problem and who maybe stabbed someone while they were in an alcoholic stupor and they're put under our jurisdiction. * * * The problem the board has is that kind of person can be very dangerous if they drink alcohol but the doctors will testify that's not a mental illness, they don't have a mental illness[.]'
"Id . at Tape 269, Side B.
"The subject of defining the conditions that constitute a 'personality disorder' arose again at a later hearing. During the course of further testimony from the Executive Director of PSRB, Representative Hill asked whether the distinguishing characteristic of a 'personality disorder' is the individual's self control. The Executive Director replied that some individuals can control their disorders, while others cannot. She explained that 'the perfect example would be that one of the personality disorders would be somebody that's alcohol or drug dependent.' Tape Recording, House Committee on Judiciary, HB 2075, May 13, 1983, Tape 324, Side A (statement of Felicia Gniewosz).
*103 "It was at that point that the current wording of the statute was first proposed. Representative Courtney asked Jeffrey Rogers, the chair of the legislative interim task force that had drafted the bill, to *474 propose wording that would accomplish the exclusion of 'personality disorders' from the statutory definition of 'mental disease or defect.' Rogers responded with the wording that is, in substance, the current law. The wording was adopted by the House Judiciary Committee without objection. Tape Recording, House Committee on Judiciary, HB 2075, May 13, 1983, Tape 324, Side A.
"The House Judiciary Committee ultimately approved the bill, including the exclusion for 'personality disorders.' Interestingly, in the staff measure analysis prepared for the benefit of the committee members, the effect of the bill was summarized in the following terms:
" 'The bill as amended further limits the scope of mental diseases or defects for which a person may be found, under present law, "not responsible." Existing law excludes abnormalities manifested only by repeated criminal or otherwise antisocial conduct. The bill would exclude, in addition, any abnormality which constitutes solely a personality disorder, which includes such diagnoses as sexual conduct disorders, drug dependent and alcohol dependent.'
"Staff Measure Analysis, House Committee on Judiciary, HB 2075 (1983).
"The bill moved to the floor of the House, where the floor manager, Representative Courtney, explained that it contained a 'personality exclusion' that accomplished a narrowing of the definition of 'mental disease or defect.' Quoting from a letter from PSRB's Executive Director to the House Judiciary Committee, he explained:
" 'Right now if a person has what is considered a personality disorder, by that I mean what they call "anti-social, inadequate, passive-aggressive, sexual conduct disorders, drug dependent, alcohol dependent, or paranoid," if they fit into that personality disorder category they're able to claim that they have a mental disease or defect. We now no longer, with this piece of legislation, will allow an individual to say that I have a mental disease or defect because I have a personality disorder.'
*104 "House Floor Debate, HB 2075, June 16, 1983, Reel 19, Track I (Rep Peter Courtney).
"After passage by the House, the bill was referred to the Senate Judiciary Committee. At the first hearing on the bill, Representative Courtney introduced it to the committee and explained that it 'would remove personality disorders as a category that could be relied on for use of the insanity plea.' Tape Recording, Senate Committee on Judiciary, HB 2075, June 29, 1983, Tape 234, Side A (Rep Peter Courtney). A 'personality disorder,' he explained, included such conditions as 'anti-social, inadequate, passive-aggressive, sexual conduct disorders, drug dependent, alcohol dependent, paranoid, etc.' Id .
"Rogers also testified before the Senate Judiciary Committee. He explained the findings of a recently completed study that he and two professors from OHSU had completed concerning the insanity defense in Oregon. The report explicitly categorized alcohol and drug dependency as 'personality disorders.' Senate Judiciary Committee, HB 2075, June 29, 1983, Unmarked Exhibit ('Oregon's New Insanity Defense System: A Review of the First Five Years-1978-1982').
"The Senate Judiciary Committee, concerned that the concept of 'personality disorder' was too difficult to define, deleted the exclusion from the bill, and the Senate approved the bill as amended.
"The bill then moved to a conference committee. The first topic of discussion was the deletion of the 'personality disorder' exclusion. Representative Courtney explained that he was satisfied that the term was practicable. He referred to the Rogers insanity defense study and its list of diagnoses-including, among other things, drug and alcohol dependency-that qualified as 'personality disorders.' Tape Recording, Conference Committee, HB 2075, July 13, 1983, Tape 550, Side A. The committee ultimately agreed to restore the 'personality disorder' exclusion. The staff measure analysis of the final version of the *475 bill explained that, as amended, the bill 'would exclude * * * any abnormality which constitutes solely a personality disorder, which includes such diagnoses as sexual conduct disorders, drug dependent and alcohol dependent.' Staff Measure Analysis, House Committee, HB 2075, 1983. As amended by the conference committee, the bill was passed by both houses and signed into law."
*105 Beiswenger , 192 Or.App. at 48-51, 84 P.3d 180 (first emphasis in Beiswenger ; second and third emphases added; second through seventh brackets in Beiswenger ). That legislative history led the Supreme Court to conclude that the legislature intended to include substance dependency as a "personality disorder" and, thus, that it is not a "mental disease or defect."
To avoid the same conclusion as to drug-induced psychosis, defendant points to a remark in the witness testimony of PSRB chair Snyder-a remark omitted in the legislative account in Tharp and Beiswenger. Based on that remark, defendant contends that the 1983 legislation did not change prior case law as to that point. Snyder's remark appears incidentally as part of her description of drug use that is not a mental disease:
"I might give you an example of what we are talking about. For example, we do every once in a while get people who have an alcoholic problem and who maybe stabbed someone while they were in an alcoholic stupor and they're put under our jurisdiction. Well, technically they shouldn't in law, and in fact, they shouldn't be under our jurisdiction. The testimony of the doctors is that they do not have a mental disease or defect. They may be those very dangerous people who anytime they start drinking. The problem the board has is that kind of a person can be very dangerous if they drink alcohol but the doctors will testify that's not a mental illness, they do not have a mental illness, they haven't been drinking so much that their brain is fried but if they drink they can be very dangerous. The board's put in the position of having to make a decision to discharge a person because they don't have a mental illness under the definition."
Tape Recording, House Committee on Judiciary, HB 2075, Apr. 27, 1983, Tape 269, Side B (statement of Judy Snyder) (emphasis added). Emphasizing Snyder's reference to the situation in which a person's "brain is fried," defendant contends that the 1983 legislature did not intend to "abrogate[ ] [the] longstanding principle of Oregon law" that insanity can be caused by intoxication.
Looking to cases decided prior to the 1983 amendment, defendant argues that the Supreme Court indicated in State v. Herrera , 286 Or. 349, 360, 594 P.2d 823 (1979), and *106 State v. Smith , 260 Or. 349, 490 P.2d 1262 (1971), that insanity caused by intoxication should be treated the same as insanity brought about by another cause. Therefore, defendant concludes, the trial court erred in instructing the jury that defendant's drug-induced psychosis did not qualify as a mental disease or defect. We are not persuaded.
In Herrera , the court considered a defendant's argument that evidence of drug dependence alone was sufficient evidence of a mental disease or defect to entitle him to a mental disease or defect instruction. 286 Or. at 360, 594 P.2d 823. At that time, the 1971 version of the insanity statute, ORS 161.295, like the current version, excluded from the definition of mental disease or defect "abnormalit[ies] manifested only by repeated criminal or otherwise antisocial conduct." That version, however, did not exclude "personality disorders." Given that version of the statute, the court made two observations. First, evidence of drug dependence alone would not be enough evidence of a mental disease or defect to justify the instruction; second, "further evidence which indicates that drug dependence has resulted in a mental disease or defect-evidence beyond the mere fact of dependence itself-will have to be presented" to warrant the instruction on mental disease or defect. Id . at 362, 594 P.2d 823.
In reaching its conclusion, the Herrera court quoted Smith , an earlier decision, which had observed:
"[T]his court has made a distinction between the effects of temporary intoxication and the long-term effects of extended or gross intoxication. We have frequently stated, 'if excessive and long-continued use *476 of intoxicants produces a mental condition of insanity, permanent or intermittent, which insane condition exists when an unlawful act is committed, such insane mental condition may be of a nature that would relieve the person so affected from the consequences of the act that would otherwise be criminal and punishable.' * * * These cases treat insanity caused by intoxication the same as insanity brought about by any other cause."
260 Or. at 352-53, 490 P.2d 1262. The Herrera court observed that "[o]ur opinion in Smith is predicated on the understanding that evidence has been presented showing that the [substance use] has resulted in 'insanity.' " 286 Or. at 362, 594 P.2d 823 (emphasis *107 added).[5] Defendant argues that, under Smith and Herrera , defendant's drug-induced psychosis is a mental disease or defect that "does not need to exist independent of any voluntary intoxication or drug dependency to be used as a basis for an insanity defense."
Assuming without deciding that the quoted statement in Smith and Herrera retains vitality after the 1983 amendment, we read the statement to describe a situation in which a defendant has a chronic mental impairment, which was caused by substance abuse, and which continues to impair the defendant, despite cessation of substance abuse, beyond the periods of intoxication and withdrawal.[6] See Smith , 260 Or. at 352, 490 P.2d 1262 ("[T]his court has made a distinction between the effects of temporary intoxication and the long-term effects of extended or gross intoxication."); see also State v. Wallace , 170 Or. 60, 81, 131 P.2d 222 (1942) (observing a distinction between "voluntary immediate drunkenness on the one hand and derangement from the use of intoxicants which has become fixed and continued"); cf. Hanson v. PSRB , 156 Or.App. 198, 207 n. 1, 965 P.2d 1051 (1998) (De Muniz, J., concurring), rev.'d and rem'd on other grounds , 331 Or. 626, 19 P.3d 350 (2001) ("In the light of [ ORS 161.125(1) ], it is difficult to understand how alcohol-induced delusions could legitimately constitute a mental disease defense."). Consistently, Snyder's remark about someone whose "brain is fried" may be understood to refer to a person who suffers chronic mental impairment and whose disability continues to manifest independently of the use of or withdrawal from drugs. See Wallace , 170 Or. at 81, 131 P.2d 222 ("The distinction between voluntary immediate intoxication resulting in a mental derangement which does not relieve of responsibility, and *108 settled insanity of a more or less permanent nature which is a defense is generally recognized.").
For many of the same reasons that the Supreme Court concluded that "substance dependency" is not a mental disease or defect, we conclude that, on these facts, transitory, episodic, drug-induced psychosis is not a "mental disease or defect." That is because, in the 1983 session, the legislature heard testimony that "personality disorders," those conditions that are to be excluded from the category of "mental disease or defects," include not only drug dependency but also "drug-induced syndromes" and alcoholic "stupors." The thrust of Snyder's testimony was that " 'personality disorders' include * * * persons 'suffering from a drug-induced syndrome.' " Tharp , 338 Or. at 427, 110 P.3d 103 (quoting Beiswenger , 192 Or.App. at 48-51, 84 P.3d 180 ; and citing Tape Recording, House Committee on Judiciary, HB 2075, Apr. 27, 1983, Tape 270, Side A, statement of Judy Snyder). In light of the legislative history as a whole, we are persuaded that the legislature intended to exclude transitory, episodic, drug-induced psychosis from the definition *477 of "mental disease or defect" in ORS 161.295 and ORS 161.300.
On this record, defendant's drug-induced psychosis existed when he was under the influence of methamphetamine. The record shows that he had been continuously on methamphetamine without sleep over a week and that he was under the influence of a "high dose" of methamphetamine at the time of the murder. The experts testified that defendant's psychosis was triggered by his voluntary use of methamphetamine.[7]
Johnson described that, as defendant drove from Oregon, the psychotic effects dissipated as the "meth was *109 beginning to wear off and the further he got." Although defendant argues that a drug-induced psychosis is "a condition that may exist independent of the current drug use," both experts agreed that, as to this defendant, there was "no evidence" of "any lingering psychosis" or long-term mental disorder from chronic substance abuse. Johnson testified that defendant did not "exhibit any evidence of any mental disorder other than that which was induced by his voluntary intoxication by methamphetamine."
Larsen observed that, at the time of his examination, defendant did not exhibit signs of psychosis. The psychosis was something "onset" with use of methamphetamine. Larsen said that defendant's drug-induced psychosis"clears after a period of time." Johnson concurred, saying that defendant's drug-induced psychosis is a "transient disorder." The psychosis"starts and stops when you use [the drug]." He said, "[W]hen you remove the agent, the drug, the psychosis is no longer there." He concluded that "there's no evidence * * * to indicate that [defendant] has a psychotic disorder outside of his use of methamphetamine."
Taken together, the experts agreed that defendant's psychosis existed only while under the influence of methamphetamine and that he did not have an impairment that existed independently of his intoxication or its aftermath. For that reason, we conclude that, on these facts, the trial court did not err giving a jury instruction that, for purposes of ORS 161.295 and ORS 161.300, mental disease and defect did not include drug use, drug dependency, or drug-induced psychosis.
COSTS
We address briefly defendant's second assignment of error. Defendant contends that the court erred in imposing $3,627.30 in costs under ORS 161.665(7) for the expense of extraditing defendant. The court did not make findings regarding defendant's ability to pay and there is no evidence in the record about defendant's current or future ability to pay. The state concedes the error. See ORS 161.665(4) (the court may not sentence a defendant to pay costs without finding that defendant is or may be able to pay them); State *110 v. Kanuch , 231 Or.App. 20, 24, 217 P.3d 1082 (2009) (same). We accept the state's concession and reverse the trial court's award of $3,627.30 in extradition costs.
Portion of judgment requiring defendant to pay extradition costs reversed; otherwise affirmed.

We use the phrase in effect at the time of trial. In 2017, legislative amendments changed language in both statutes, replacing the term "mental disease or defect" with the term "qualifying mental disorder." Or. Laws 2017, ch. 634, §§ 3, 4 (SB 64). A number of other pertinent statutes have been amended since the date of the crime. Unless otherwise noted, all references are to the versions of the statutes that were in effect at that time.

Defendant also argues that the instruction constituted a comment on the evidence. Our conclusion that defendant's drug-induced psychosis is not a "mental disease or defect" as a matter of law resolves that argument.

Johnson said that defendant had not requested or received any mental health services, and, in talks with mental health professionals, defendant denied that he was interested in services. At the jail's intake, defendant reportedly said initially that he had a history of drug use and hallucinations, but later, in staff follow-up, he denied that he had a history of psychotic behavior such as hallucinations or delusions.

Although defendant argues that his diagnosis is "mixed character with some aspects of mental disorder," the experts did not diagnose defendant as having some underlying mental illness, such as a schizoaffective disorder.

The opinion in Herrera did not elaborate on the nature, extent, or lasting effects, if any, of that defendant's drug dependence. The opinion in Smith held only that a trial court erred in imposing a burden of proof on a defendant whose evidence of use of LSD at the time of a burglary was intended as a partial defense of diminished capacity, not an affirmative defense of mental disease or defect. 260 Or. at 353, 490 P.2d 1262.

Smith and Herrera implicate a doctrine described in other states as "settled insanity." That doctrine has "been consistently characterized as a state of mind resulting from 'long-continued,' 'habitual,' 'prolonged,' or 'chronic' alcohol or drug abuse leading to a more or less permanent or 'fixed' state of insanity." See, e.g. , State v. Sexton , 180 Vt. 34, 46, 904 A.2d 1092 (2006), overruled in part on other grounds by State v. Congress , 198 Vt. 241, 114 A.3d 1128 (2014) (explaining doctrine of settled insanity).

Although lay witnesses testified as to defendant's peculiar behaviors, those lay witnesses were not asked to offer expert opinions about mental illness or the cause or duration of any mental illness defendant might suffer. See State v. Wright , 284 Or.App. 641, 648, 393 P.3d 1192 (2017) (lay testimony, without more offered, lacked nexus to make intellectual disability relevant to culpable mental state); see also State v. Shields , 289 Or.App. 44, 53-54, 407 P.3d 940 (2017) (testimony failed to establish an evidentiary link between diagnosis and defendant's conduct so as to justify jury instruction on the guilty except for insanity defense, ORS 161.295 ). As presented here, defendant's argument was that the drug-induced psychosis, as diagnosed by the experts, should be recognized to be a mental disease or defect.