Argued and submitted February 11, 2020, affirmed January 21, petition for review allowed May 20, 2021 (368 Or 168)
See later issue Oregon Reports

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ERIK JOHN MEISER,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1201547; A166534

481 P3d 375

Defendant appeals from a judgment, following a bench trial, convicting him of one count of murder, ORS 163.115, and one count of second-degree burglary, ORS 164.215, and finding him guilty except for insanity (GEI) as to two counts of first-degree robbery, ORS 164.415, and other crimes. Defendant assigns error to (1) the trial court's rejection of his GEI defense to murder, (2) the trial court's failure to provide factual findings and legal conclusions explaining the murder verdict despite the GEI defense, (3) his sentence for murder as unconstitutionally disproportionate, and (4) the trial court's denial of his post-trial motion in arrest of judgment, challenging the sufficiency of the indictment's allegations of first-degree robbery. *Held*: The evidence permitted the factfinder to reject defendant's GEI defense as to the murder charge. Defendant failed to make an appropriate request at trial so as to challenge on appeal the trial court's failure to elaborate on the murder verdict or any legal dispute about the GEI defense. Defendant's life sentence was not constitutionally disproportionate. The indictment, aided by trial evidence, was sufficient to allege first-degree robbery. Accordingly, the trial court did not err in rendering its judgment.

Affirmed.

Katherine E. Weber, Judge.

Daniel J. Casey argued the cause and filed the briefs for appellant.

Leigh A. Salmon, Assistant Attorney General argued the cause and filed the brief for respondent. Also on the reply brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

DeVORE, P. J.

Affirmed.

**DeVORE, P. J.,**

Defendant was indicted on six counts of aggravated murder, ORS 163.095, two counts of first-degree robbery, ORS 164.415, one count of first-degree burglary, ORS 164.225, and two counts of second-degree burglary, ORS 164.215. Acting as factfinder, the trial court found defendant guilty of the lesser-included offense of murder, ORS 163.115 (2011),[1] and one count of second-degree burglary. The court found defendant guilty except for insanity (GEI) on the other counts. *See* ORS 161.295 (2011) (GEI defense).[2]

On appeal, defendant raises four assignments of error. In his first assignment, he disputes the trial court's rejection of his GEI defense to murder. Assuming his view of the defense is correct, he argues that there is insufficient evidence to permit a reasonable factfinder to find him guilty of murder. In his second assignment, he contends that the trial court erred in failing to provide factual findings and legal conclusions explaining the murder verdict despite the GEI defense. In his third assignment, defendant challenges his sentence for murder—life imprisonment with the possibility of parole after 25 years—as unconstitutionally disproportionate. In the same assignment, he also contends that the trial court erred by refusing to consider a belated defense of extreme emotional disturbance (EED), raised for the first time at sentencing. In his fourth assignment, he disputes the trial court's denial of his post-trial motion in arrest of judgment, challenging the sufficiency of the indictment's allegations of first-degree robbery. For the reasons that follow, we conclude that the trial court did not err, and we affirm.

---

[1] The murder and aggravated murder statutes have since been amended. Or Laws 2019, ch 65. We refer to the versions in effect at the time of the offenses in 2012.

[2] Under that statute, a "person is guilty except for insanity if, as a result of a mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity to either appreciate the criminality of his conduct or to conform the conduct to the requirements of the law." ORS 161.295 (2011), *amended by* Or Laws 2017, ch 634, § 3. As with other statutes, we refer to the version that was in effect at the time of the offenses.

## I.   FACTS

We begin with an overview of the offenses and note additional facts in our discussion of particular issues. In determining whether defendant proved his affirmative defense as a matter of law, we review the evidence, including all reasonable inferences, in the light most favorable to the trial court's verdict. *See Peters v. Belleque*, 241 Or App 701, 712, 250 P3d 456 (2011) (To warrant a judgment of acquittal "the evidence before the trial court, taken in the light most favorable to the state, must permit only one reasonable conclusion—that petitioner established each element of the defense."); *State v. McCartney*, 65 Or App 766, 769, 672 P2d 1210 (1983), *rev den*, 296 Or 638 (1984) (A motion for judgment of acquittal based on an affirmative defense may only be granted when there are no facts presented upon which "reasonable men could differ." (Internal quotation marks omitted.)).

Defendant was charged with aggravated murder arising out of an incident in which defendant murdered the victim, FH, during a home invasion gone wrong. Defendant arrived in Lake Oswego early on a September morning in 2012. Carrying a samurai sword that he had stolen from a martial arts facility, defendant walked a mile to find a neighborhood that he believed to be affluent. After identifying FH's home as one where he believed he might force the homeowners to wire him $40,000, defendant hid next door and waited for the occupants to leave.

FH and his wife, MH, left their home around 5:30 a.m. to take their dogs for a walk. Defendant entered their home, swapping the sword for a machete he found in the garage. He believed that the machete would be "more intimidating" and allow him to "control the situation better." The couple returned home about an hour later. MH picked up the newspaper, while FH attended to the dogs in the backyard. When MH entered the kitchen, she looked up from her newspaper to see defendant with fabric covering his head and holding a knife in one hand and a machete in the other. He held the knife up to his lips and whispered, "Shh, I don't want to hurt you." MH screamed. FH ran toward the kitchen to see what was wrong. Upon seeing the intruder, FH and

MH ran outside. MH called 911 from the side of the house, while FH ran down the driveway, but fell backwards into bushes. As FH laid on the ground, defendant struck FH four times with the machete. Three blows were lethal. Defendant struck until FH stopped making noise. Defendant ran back into the couple's home to get his backpack in order not to leave evidence behind, then escaped through the backyard. MH ran around the side of the house and found her husband. He died moments later.

Defendant ran through the neighborhood looking for a vehicle that he could use to escape. Defendant entered a neighbor's garage to take a bicycle, but he left it because it had a flat tire. Defendant ran to another vacant house where he changed his clothes, showered, and took a nap. At 9:00 a.m. the same morning, defendant was seen sitting at a bus stop in Lake Oswego. An officer approached him looking for suspects. The officer asked defendant if he knew anything about the incident. Defendant appeared calm, normal, and on the "happy side." He did not arouse the officer's suspicion. The officer checked defendant's ID and spoke with defendant for about five minutes.

Defendant remained in the Portland area for a couple of days. He alternated sleeping on buses, in a U-Haul, in an airstream trailer, and possibly in an abandoned house. Three days after the murder, police identified defendant from fingerprints left at the scene and announced his identity at a press conference. To change his appearance, defendant shaved off his beard at a gas station. He took a bus to Salem and made his way to Corvallis, walking along backroads. Defendant bought food and paid his expenses with money his wife wired to him through a credit union. He learned that there was a warrant out for his arrest. He used an alias to check into a motel in Corvallis. Five days after the murder, police located him using his cellphone data. They arrested defendant without incident at the motel.

During interviews with the police, defendant said that he had a "dual purpose" for the home invasion. One purpose was "restitution" for himself and one purpose was to "set [his] son free." We describe those two purposes before retelling defendant's narrative.

First, defendant explained that he believed that he had been "systemically persecuted" by a "large portion of American society," that he had been unable to find work because he had been "blacklisted," and that there were "people out there who really believe[d] that their prosperity is *** better off without [his]." He had attempted to enroll in college and believed he had been "roadblocked" when trying to get financial aid. Because he believed people were making it impossible for him to "get in" to society, he wanted to "go a step further and try to take the money that society [had] *** taken away from [him]." He developed a plan to force an affluent person to perform a "mediocre balance transfer" of $40,000 so that he could put a down payment on a condo and get a "toehold in society" as a property owner. He viewed the $40,000 as "restitution" and "reparations" for what "had been done to [him]."

Second, defendant explained that he had heard voices, whom he referred to as real people. He said that, beginning in 2006, they followed him everywhere he went and told him to do things or his children would be killed. He believed that the voices had made him a drug addict, had made him think that he needed to have sex with random women, and had been poisoning him, as evidenced by the dark circles under his eyes. The voices told him that he had been "deleted" from society and that all information regarding his existence had been removed from "the system." When he got to Lake Oswego, he said that the voices "told [him] that if [he] didn't kill that guy, that they would murder *** my son and turn my little infant daughter into a cannibal when she grew up." The voices did not identify the specific person that he was supposed to kill or how he was supposed to kill the person.

Defendant said that he arrived in Lake Oswego after randomly jumping on buses "looking for affluency." He said that he broke into the martial arts studio because there was a Corvette parked outside. He thought that the Corvette's owner would be inside and be the type of person from whom he could get the $40,000 wire transfer. Finding no one inside the studio, he decided to take the samurai sword.

Defendant said, when he chose the couple's home next, he initially "never wanted to hurt anybody." Consistent with his "dual purposes," he "simply wanted a balance transfer" that would be "enough for [him] to get a toehold in society and *** to protect [his] family." Entering the couple's home, he said, he checked to make sure that there were no children in the house. He looked at bank statements in the couple's office to confirm that they were wealthy. His plan was to sit down with the couple and "have a discussion about the ailments of society and *** that [their] generation had an obligation to [him]."

Defendant said that, when the couple ran, he realized he "was going to fail, once again" and was not going to get his "mediocre balance transfer." At that point, defendant said he "panicked." The voices had "been telling [him] that the only way [he would] ever get any money [was] through this course of action," and he felt that he and his family would "always be subject to abject poverty." While he panicked, he was concerned he would have to "look into the eyes of [his] little girl and tell *** her every day of her life, 'Your father just doesn't have what it takes to give you things. I'm sorry.'" As FH looked up after falling in the bushes, defendant "knew that *** [he] couldn't get [FH] to respond to [him] and decided that this was going to be the person who [he] victimized in return for [his] victimization." Defendant explained that he "just lashed out" and thought, "I have been put through too much" and "I have had enough," as he struck FH four times with the machete. Defendant then fled the scene.

Police asked whether defendant knew his plan was wrong from the beginning. Defendant answered, "Of course I know it was wrong" but that "right or wrong and morality is out the window." He said that he "never thought [he] was doing the right thing" and that "[he] knew what [he] was doing was *** not a good thing to do the whole time."

The state charged defendant with aggravated murder and other offenses. The trial court found defendant able to aid-and-assist in his defense. Defendant waived his right to a jury and tried his case to the court as factfinder. Defendant did not dispute that he had committed the acts,

but he asserted a GEI defense. He offered the testimony at trial of three psychiatrists and a psychologist, who testified that defendant suffers from schizophrenia and antisocial personality disorder.

The trial court found defendant guilty of murder, as the lesser included offense of aggravated murder, and guilty of second-degree burglary, related to entry into a neighbor's house to steal the bicycle. The trial court found defendant guilty except for insanity as to the other charges, related to the first-degree robbery of FH and MH, the first-degree burglary of their home, and the second-degree burglary of the martial arts studio.

## II.   THE GEI DEFENSE

On appeal, defendant first assigns error to the trial court's rejection of his GEI defense as to murder.[3] The trial court had not expressly addressed the legal or factual disputes between the parties in colloquy or a written opinion. Instead, the court rendered its verdicts like a jury without elaboration. For that reason, defendant addresses on appeal each disputed element in his GEI defense, in order to show that he was entitled to prevail on the defense as a matter of law. *See Peters*, 241 Or App at 712 (the evidence must permit only one reasonable conclusion, that defendant established each element of the defense). He first asserts the legal proposition that he should be permitted to prove that he lacked the requisite capacity as a result of a *combination* of schizophrenia, which *is* a qualifying mental disease or defect, and antisocial personality disorder, which is *not* a qualifying mental disease or defect.[4] Next, he contends that the evidence requires a finding that his resulting incapacity rendered him unable to appreciate the criminality of his conduct under a subjective moral standard. Alternatively,

---

[3] Although the trial court rejected defendant's GEI defense as to murder and one count of second-degree burglary, defendant does not argue that the trial court erred in rejecting his GEI defense as to second-degree burglary.

[4] In 2017, the legislature amended ORS 161.295, replacing the term "mental disease or defect" with the term "qualifying mental disorder." Or Laws 2017, ch 634, § 3. The amendment was not effective until January 1, 2018, and is not applicable in this case. Here, for convenience, we use the term "qualifying mental disease or defect" to refer to a mental disease or defect that is not excluded by ORS 161.295(2), which we quote below.

he contends that the evidence requires a conclusion that his resulting incapacity rendered him unable to conform his conduct to the requirement of law.

The state responds that the requisite incapacity must result from a qualifying mental disease or defect itself, not from a combination of qualifying and nonqualifying impairments. The state relies on our decision in *State v. Peverieri*, 192 Or App 229, 84 P3d 1125, *rev den*, 337 Or 248 (2004). The state argues that combined disabilities are not recognized to cause or result in the requisite incapacity for a GEI defense. Next, as to one of two forms of incapacity, the state responds that the incapacity is not determined by defendant's ability to "appreciate the criminality" of his conduct based on a "subjective moral standard." Regardless of the answer to that dispute, the state concludes that the evidence permitted a finding that defendant appreciated the criminality of his conduct and that he was able to conform his conduct to the requirements of law.

A.  *Mental Disease or Defect Resulting in Incapacity*

Defendant's initial argument about a combination of impairments presents a preliminary question of statutory interpretation. As such, we review the question as a matter of law. *Peverieri*, 192 Or App at 232. The essential terms of law appear in ORS 161.295. The statute describes the GEI defense in its central and its supplemental paragraphs:

"(1)   A person is guilty except for insanity if, as a result of a mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2)   As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

Reading the paragraphs together, we have said that a defendant seeking to establish a GEI defense "must show that, at the time of the crime, as a result of a mental disease or defect (which does not include a personality disorder or general antisocial behavior), the defendant lacked

the substantial capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of law." *State v. Shields*, 289 Or App 44, 47, 407 P3d 940 (2017), *rev den*, 362 Or 794 (2018). In our context, defendant is required to show that the evidence was so compelling that no rational fact finder could have determined that defendant *failed* to establish the affirmative defense of GEI. Defendant must show that there was no factual dispute on the several elements of the defense. *Id.* at 48. Those elements are that (1) defendant suffered a qualifying mental disease or defect (2) that resulted in (3)(a) an incapacity to appreciate the criminality of his conduct or (b) an incapacity to conform his conduct to the requirements of the law. *See* ORS 161.295; *Shields*, 289 Or App at 47 (describing the elements of a GEI defense).

Because defendant has addressed each element in order to argue that he should prevail as a matter of law, we have reviewed the arguments on each element. We recount each argument, but we emphasize the legal dispute about the second element involving causation, because the law's answer on combined causes is dispositive on these facts. We conclude that the evidence permitted a rational factfinder to conclude that a requisite mental disease or defect was not *the* cause of a requisite incapacity at the time of the murder. We note the differing evidence on the subsequent issues whether defendant had the capacity to appreciate criminality of his act or to conform his conduct to the law, but, as we explain, we need not decide whether a rational factfinder could have rejected the GEI defense on those grounds.

On the first element of the GEI defense, there is no dispute between the parties that defendant's schizophrenia is a mental disease or defect within the meaning of the statute. The supplemental paragraph that is ORS 161.295(2) defines what is *not* a qualifying "mental disease or defect" by excluding "an abnormality manifested only by repeated criminal or otherwise antisocial conduct" and excluding "any abnormality constituting solely a personality disorder." Schizophrenia is not among those particular disabilities specifically excluded from recognition as a qualifying "mental disease or defect."

On the second element, we consider whether defendant suffers a mental disease or defect *that results in* or causes a requisite incapacity (an incapacity that is to be established as one of two alternatives). On the issue of causation, the parties differ on the question whether an incapacity to appreciate criminality or conform conduct must be the result of a mental disease or defect or may be the result of a mental disease or defect *in combination* with a nonqualifying impairment or abnormality. In particular, the parties differ over the applicability of *Peverieri*, our decision on voluntary intoxication when combined with an ostensible mental disease or defect.

In *Peverieri*, the defendant was charged with attempted aggravated murder, and he tried the case to the court as factfinder. *Peverieri*, 192 Or App at 231. The court rejected his GEI defense, and he appealed, contending that the court had erred in failing to find him guilty except for insanity. *Id.* at 231-32. The defendant had shot at a police officer. *Id.* at 231. At the time, he suffered from chronic liver failure, which caused ammonia to accumulate in his blood. That caused him to lose the ability to think clearly and created memory problems.[5] Before the shooting incident, he drank alcohol. The combination of his cognitive impairment and alcohol use caused him to become agitated and paranoid when he committed the crime. A psychiatrist testified that the defendant was incapable of conforming his conduct to the requirements of the law. *Id.* The defendant did not claim that his cognitive impairment *alone* constituted a mental disease or defect. Instead, he claimed that the *combination* of a mental disease or defect *with* alcohol caused him to be unable to conform his conduct to the law. *Id.* The trial court rejected the defendant's combination theory. *Id.* at 233.

On appeal, the defendant contended that nothing in ORS 161.295 precluded the GEI defense when a qualifying mental disease or defect was combined with another condition, disability, or abnormality. *Id.* at 232. The defendant pointed out that ORS 161.125 provided that voluntary intoxication, "as such," cannot constitute a defense, but that

---

[5] We assumed for the sake of analysis that the liver complications qualified as a mental disease or defect. *Peverieri*, 192 Or App at 233.

should not mean that the statute foreclosed his reliance on intoxication in combination with other conditions as a basis for the insanity defense under ORS 161.295. Insofar as that goes, we agreed, but recognized that that did not mean that "there is not some other statute that is such an impediment." *Id.* We determined that ORS 161.295 "is just such a statute." *Id.* We explained that

> "ORS 161.295(1) provides that a person is guilty except for insanity if he or she proves that the lack of substantial capacity is 'a result of mental disease or defect' at the time of the crime. The statute does not provide that the defense is available upon proof of a lack of capacity as a result of mental disease or defect *in combination with* other factors such as voluntary alcohol consumption. When the legislature wants to require proof of either a single cause or a combination of causes, it generally does so. In this instance, the legislature did not do so. It stated only that insanity may be claimed upon proof that a defendant's condition is a result of a mental disease or defect."

*Id.* at 232-33 (emphasis in original; citations omitted). We concluded that the defendant's condition at the time of the crime was not a result of a mental disease or defect, "but rather that it was a result of the mental disease or defect *and* voluntary intoxication." *Id.* at 233 (emphasis in original). Therefore, the statute did not apply, and the trial court did not err in rejecting the defendant's insanity defense. *Id.*

Defendant argues that *Peverieri* is distinguishable because the GEI defense in that instance was based on a mental disease in combination with voluntary intoxication. He argues that the case did not implicate ORS 161.295(2), which expressly but incompletely excludes personality disorders from the definition of "mental disease or defect." Defendant accepts that his antisocial personality disorder is an excluded personality disorder. But, he stresses that a qualifying "mental disease or defect" in ORS 161.295(2), excludes "any abnormality constituting *solely* a personality disorder." (Emphasis added.) Therefore, defendant argues, the exclusion of antisocial personality disorders from qualifying "mental disease[s] or defect[s]" should only occur where a defendant's disability is only a personality disorder. He argues that a personality disorder in combination with

schizophrenia should be recognized to result in incapacity to appreciate criminality and conform one's conduct.

Before going further, we note that defendant has not referred us to any relevant legislative history on the original enactment of ORS 161.295(2) (Or Laws 1971, ch 743, § 36), which uses the term "only" with reference to the exclusion of criminal conduct, nor to the amendment of ORS 161.295(2) (Or Laws 1983, ch 800, § 1), which uses the term "solely" with its reference to exclusion of personality disorders. *See Beiswenger v. PSRB*, 192 Or App 38, 48-53, 84 P3d 180, *rev dismissed*, 337 Or 669 (2004) (reviewing legislative history of HB 2075 (1983)). In passing, defendant comments that *Peverieri* "erred" by failing to address ORS 161.295(2), but defendant does not ask us to overrule *Peverieri*.[6] Defendant does not develop any argument that *Peverieri* was *plainly wrong* in construing ORS 161.295(1) at the time it was decided. *See State v. Civil*, 283 Or App 395, 406, 388 P3d 1185 (2017) (explaining standards for overruling precedent only when "plainly wrong"). Nor has defendant suggested that *Peverieri*, in construing the causation element of ORS 161.295(1), has been drawn into question by any subsequent decision of the Oregon Supreme Court. Instead, defendant only seeks to distinguish *Peverieri* by suggesting that the case did not implicate ORS 161.295(2) while this case does. Therefore, we do not question whether *Peverieri* correctly construed the causation element of ORS 161.295(1).

Although defendant insists that *Peverieri* is distinguishable, we disagree. Like the defendant in *Peverieri*, who conflated ORS 161.295(1) with the limitation in ORS 161.125 that intoxication "as such" could not be a defense, defendant conflates ORS 161.295(1) with the limitation in ORS 161.295(2) that an abnormality that is "solely" a personality disorder shall not be considered a mental disease or defect. The exclusion of personality disorders from the "mental disease or defect" only serves to exclude them from the first element of the GEI defense that requires a mental

---

[6] Defendant explains that he mentions that *Peverieri* so erred "for purposes of possible further review by the Oregon Supreme Court." We express no opinion as to whether a claim that a prior decision is wrongly decided, supported by a developed argument in this court, is necessary for review in the Supreme Court.

disease or defect. *See Shields*, 289 Or App at 48-50 (first determining whether defendant was diagnosed with a qualifying mental disease or defect). The second element of the GEI defense still requires that a qualifying mental disease or defect *result in or cause* defendant's incapacity to appreciate criminality or conform his conduct. That second element is the same "impediment" that we recognized in *Peverieri* to require that the mental disease or defect must be the cause of incapacity. The phrase that we quoted in *Peverieri*, "a result of mental disease or defect," precludes causation in "combination with other factors." 192 Or App at 232-33. It does not matter that, in *Peverieri*, intoxication "as such" was limited by another statute (ORS 161.125), while, in this case, "solely" a personality disorder is limited by the supplemental paragraph of the GEI statute (ORS 161.295(2)). In both cases, a mental disease or defect must be the cause of incapacity that substantially renders a defendant unable to appreciate criminality or conform conduct to the law.

As a consequence, *Peverieri* determines our construction of ORS 161.295 and becomes the standard for reviewing the evidence on the second element in the GEI defense. We must determine whether defendant's asserted incapacity was "a result of a mental disease or defect," rather than as a result of combination with some nonqualifying factor, impairment, or abnormality. Applying that standard, we must determine whether, as a matter of law, the evidence below was such that no rational factfinder could have rejected defendant's GEI defense. *See Shields*, 289 Or App at 53; *State v. Smith*, 21 Or App 270, 279-80, 534 P2d 1180 (1975). In doing so, we must review all relevant facts in the light most favorable to the state. *See Peters*, 241 Or App at 712

At trial, the primary source of evidence on the issue was the testimony of the mental health professionals called by defendant. In reviewing that testimony, we observe that, when considering the evidence of the medical experts, the trier of fact is not required to accept the conclusions of expert witnesses. *See Beiswenger*, 192 Or App at 53 (so noting in the context of how to define "mental disease or defect"). If there is expert evidence that the factfinder decides does not carry convincing force over other evidence in the case, the

factfinder may make its determinations based upon the latter. *State v. Siens*, 12 Or App 97, 102, 504 P2d 1056 (1973). We have noted that the "legislature wished the determination of whether an individual suffers a 'mental disease or defect' *not* to be exclusively within the domain of psychiatric or psychological professionals." *Beiswenger*, 192 Or App at 53 (emphasis in original). After reviewing the evidence in that light, we conclude that a rational factfinder could have determined that defendant failed to establish that his asserted incapacity was the result of schizophrenia, defendant's qualifying mental disease or defect.

Defendant's experts testified that, at the time of the crimes, defendant suffered both schizophrenia and antisocial personality disorder. Based on that testimony, defendant argued that schizophrenia resulted in a lack of capacity to appreciate the criminality of his conduct or to conform his conduct to legal requirements. He argued that his antisocial personality disorder played no role. The state did not contest the schizophrenia diagnosis, but the state argued that defendant's schizophrenia and antisocial personality disorder were co-occurring and that the antisocial personality was manifest at the time of the murder.

Each mental health witness had examined defendant or reviewed his medical history from 2010 to 2016. Up until 2014, the consensus diagnoses was that defendant manifested two disorders: delusional disorder and antisocial personality disorder. In 2014, psychiatrist Choi revised his diagnoses to schizophrenia and antisocial personality disorder.

At trial, psychiatrist Kleinman described the hallmarks of schizophrenia typically to include hallucinations, delusions, and a disordered thought process where the affected person's speech or behavior is disconnected and not logical. As he described it, the onset of schizophrenia typically corresponds with an irreversible 10-point IQ drop. Psychiatrist Peykanu explained that the symptoms of schizophrenia commonly prevent persons from forming long-term relationships and impairing their ability to communicate in a linear or coherent manner about subjects related to their delusions. Dr. Choi said schizophrenia causes people to lose

their ability to demonstrate a normal range of emotional affect, and Dr. Kleinman said schizophrenia hinders people from being resourceful. Dr. Choi testified that schizophrenia is not typically associated with an increase in violence.

Dr. Choi testified that defendant's second and co-occurring diagnosis, antisocial personality disorder, is characterized by repeated criminal activity, a disregard for the rights of others, repeated acts of aggression, consistent irresponsibility, and being unable to maintain employment.

Each professional who testified about defendant's diagnoses testified that defendant had schizophrenia and antisocial personality disorder. That testimony indicated that, as a result of his schizophrenia, defendant had been experiencing command-auditory hallucinations for the six years leading up to the murder. Dr. Choi testified that, on the day of the murder, defendant was experiencing command hallucinations that were "influencing his behaviors" and "giving him a push" to take action in order to protect his family from imminent harm. Dr. Choi concluded that, without these hallucinations, defendant would not have entered the couple's home or murdered FH, and that defendant's actions were a result of his schizophrenia and his "highly psychotic" state.

Dr. Choi, however, also testified that defendant's command hallucinations "weren't definitive and overwhelmingly powerful" and were present only to a "moderate degree." In their opinions, defendant could set parameters on his command hallucinations, as evidenced by his commitment to leaving the couple's home if he had discovered children inside or if the couple had not appeared to be wealthy. Dr. Beaver, a clinical neuropsychologist, testified that defendant felt he had a choice as to whether to go through with the robbery. The professionals testified that, at the time of defendant's acts in 2012, defendant demonstrated all of the described criteria of antisocial personality disorder. They testified that, leading up to his arrival in Lake Oswego, he had demonstrated anger, violence, repeated criminality, impulsivity, and a reckless disregard for the safety of others—all criteria of antisocial personality disorder rather than schizophrenia.

Defendant told the psychiatrists that, upon arriving at the couples' home, his intention was to just rob the couple and get money and that he did not plan to kill anybody. When FH fell into the bushes, defendant realized that he was not going to succeed in getting a bank transfer. Defendant repeatedly told the psychiatrists that he "panicked." At that time, Dr. Choi and Dr. Beaver testified, defendant's language describing the attack was no longer focused on saving his family but on what another generation "owe[d] him," his anger at being stuck in "abject poverty," and his fear of being a "deadbeat dad." On cross-examination, Dr. Choi acknowledged that it was possible that, given defendant's description of the murder, defendant was just angry and he lashed out. Dr. Choi summarized that what "drove" defendant—whether psychosis, as he believed, or just panic and anger—could both be true.

Despite the experts' testimony that they believed that defendant's incapacity was caused by his schizophrenia, a reasonable factfinder could nonetheless conclude that, as defendant looked at FH in the bushes, he was motived to kill out of revenge against an affluent member of an older generation for his economic position. A rational factfinder could conclude that it was anger expressed in the attack, indicative of antisocial personality disorder, rather than schizophrenia, which is not typically expressed in violence. Defendant had the ability to set limitations on his hallucinations and said that he would have aborted his robbery attempt if specific conditions, such as the absence of children, were not fulfilled.

Based on expert testimony and defendant's narrative, a rational factfinder could have concluded that defendant did not prove that his lack of capacity—to appreciate criminality or conform his conduct—*was the result* of his schizophrenia. Rather, the evidence permitted the factfinder to conclude, at the least, that defendant's schizophrenia and antisocial personality disorder were both active impairments. The record permitted a determination that defendant's compromised capacity at the critical moment was wholly, or in part, the result of antisocial personality disorder. Therefore, defendant did not establish, as a matter

of law, the causation element of the GEI defense. His compromised capacity could be found, not to be *the* result of a mental disease or defect. *See Peverieri*, 192 Or App at 232-33. In short, the evidence on the second element of the GEI defense was sufficient to permit the factfinder to reject defendant's GEI defense to murder.

B.  *Inability to Appreciate Criminality*

Assuming that he satisfied the causation element as a matter of law, defendant next argues that undisputed evidence at trial established the requisite incapacity, in one of its alternate forms, in that he lacked the substantial capacity to emotionally appreciate the criminality of his conduct. He argues that to "appreciate criminality" is based on a "subjective moral standard." The state disagrees that the issue turns on whether defendant personally believed his act to be moral.[7] The state adds that, even if that were the standard, based on the record, a rational factfinder could conclude that defendant did appreciate the criminality of his conduct under that standard.

Whatever the standard, the evidence at trial appears to be conflicting. Defendant's expert, Dr. Choi, testified that, in his opinion, defendant lacked the substantial capacity to appreciate the criminality of his conduct during the murder because, "[f]rom the defendant's point of view," defendant believed that his acts were "justified." Dr. Choi recalled that defendant had said, "Well I felt bad. I knew what I was doing was wrong * * * but in the end I felt like I had to do what I had to do to protect myself and protect my children." As noted above, however, the trial court was not required to accept the opinions of experts. *See Beiswenger*, 192 Or App at 53 (so holding in the context of how to define "mental disease or defect").

When interviewed by police, defendant was asked if he knew whether his plan as he was entering the couple's

---

[7] The United States Supreme Court recently listed Oregon as one of 16 states having insanity defense statutes that have "reoriented the test to focus on the defendant's understanding that the defendant's act was *illegal*—that is, legally rather than morally 'wrong.'" *Kahler v. Kansas*, ___ US ___, ___, 140 S Ct 1021, 1035 n 10, 206 L Ed 2d 312 (2020) (including ORS 161.295 on a list of insanity defense statutes that "excluded from the ranks of the insane those who knew an act was criminal but still thought it right").

home was "dangerous or wrong." Defendant responded, "Of course I know it was wrong," but that at that moment "right or wrong and morality [was] out the window." Defendant told the police that he "knew what he was doing was not a good thing the whole time." He told police that, at the moment he attacked FH with the machete, he had "lashed" out in order to "victimize" FH in the same way that he had been victimized by society. Thus, the state emphasizes that part of the record, which permits a factfinder to conclude that, even with a subjective moral standard, defendant understood his actions to be "wrong."

We need not resolve whether the first alternate form of incapacity, involving appreciation of criminality, is determined by a subjective standard. It is unnecessary to resolve the legal or factual disputes on this point because the trial court's rejection of the GEI defense is already justified by the facts that permit the trial court to have found that defendant's asserted incapacity, in whatever form, is not the result of a mental disease or defect.

C.  *Inability to "Conform Conduct to the Law"*

Our response is necessarily the same when defendant argues that the evidence, as a matter of law, required the conclusion that, alternatively, he lacked a substantial capacity to conform his conduct to the requirements of the law. Again, the evidence appears to be conflicting. Dr. Choi testified that defendant was experiencing "auditory hallucinations that told him to do things, that he was able to resist some of the time and made it more difficult to resist other times." The psychiatrist also testified, however, that he believed that defendant understood that "killing [FH] is legally wrong." Dr. Choi testified that defendant was able to limit the power of the command hallucinations and formulate alternatives. The psychiatrist testified that defendant "didn't completely lack the capacity to *** make choices or control his behaviors." Defendant told police that he could choose when he obeyed his hallucinations and when he would have decided to ignore their commands, as reflected in his commitment to have left the couple's home if children had been present or if he did not think the couple was sufficiently wealthy. Defendant repeatedly told police that, upon showing up to the home, his only intent was to rob the couple.

It is unnecessary for us to determine whether, based on that evidence, a rational factfinder could conclude that defendant was able to conform his conduct to the requirements of law. Although defendant must establish that the evidence compelled a factfinder to reach only one conclusion on this if not the prior alternative form of incapacity, the evidence already suffices to have permitted the factfinder to have found that defendant did not establish, as a matter of law, that either form of incapacity was caused by a mental disease or defect. The evidence permitted the trial court, sitting as factfinder, to reject the GEI defense. Accordingly, the trial court did not err in convicting defendant of murder.

### III.   REQUEST FOR FINDINGS AND CONCLUSIONS

In his second assignment, defendant argues that the trial court erred, after its verdicts, by declining his request to make factual findings and legal conclusions on the murder verdict and GEI defense. In a bench trial, we review for legal error a trial court's denial of a party's request for the court to make a required record of its ruling on the disputed elements of a charged crime. *State v. Colby*, 295 Or App 246, 252 n 4, 433 P3d 447 (2018).

Defendant relates that, after the court announced its verdicts, he made a generalized, verbal request in which he "ask[ed] the [c]ourt for findings of fact and conclusions of law." At trial, he was not more specific. On appeal, he specifies that it was "reversible error [for the trial court] to refuse [his] explicit request for factual findings and legal conclusions to explain the court's GEI verdict on the lesser offense of murder." Defendant argues that the trial court's failure to state the elements of the GEI defense that it used to make its decision resulted in a record that is "insufficient to determine whether the trial court accepted" the state's arguments regarding whether defendant could "appreciate the criminality" of his conduct. The state argues that, if the trial court did err, the error is harmless, because defendant's proposed "subjective morality prong" of the GEI defense was an erroneous interpretation of the GEI standard.[8]

---

[8] We do observe that, in a supplemental memorandum submitted during trial, defendant asserted his interpretation of the meaning of the phrase "appreciate

Defendant relies on *Colby*. In that case, the defendant was convicted of fourth-degree assault, ORS 163.160, in a bench trial. 295 Or App at 247. Although the defendant had waived a jury, he had submitted proposed jury instructions before trial. In his instructions on the offense at issue, the defendant described a different mental state requirement than was described in the state's submitted jury instructions. *Id.* at 247-48. After the court rendered its verdict, the defendant asked the court, "[W]ith regard to the special jury instructions that I submitted, is the Court taking those into consideration in this verdict?" *Id.* at 248. The defendant then clarified his request, asking, "[T]he jury instructions that I submitted, are you agreeing with that interpretation as to the law?" *Id.* The defendant then reiterated that "the special jury instructions submitted contained the correct statement of the law, which needed to be considered by the trial court in rendering the verdict" for "preservation purposes." *Id.* at 249, 248. The court denied the defendant's request to state the elements of law, based on the defendant's proposed jury instructions, that the court considered when reaching its guilty verdict. *Id.* at 249.

We concluded that the trial court erred in refusing the defendant's request to address the disputed instruction. *Id.* at 253. We determined that "a court cannot refuse to disclose the legal principles that it has applied in construing the elements necessary to adjudicate guilt, when a defendant properly raises that issue." *Id.* at 251. By submitting the proposed jury instructions and specifically asking the court whether the court agreed with the interpretation of the law as contained in the jury instructions, we held that the defendant's "request triggered the trial court's obligation to create a sufficient record" for purposes of "creating a record that allows us to review whether the trial court applied the correct principles of law in reaching its verdict." *Id.* at 252.

---

the criminality" as contained in ORS 161.295(1). He interpreted the term "appreciate" to mean that "an offender must be emotionally as well as intellectually aware of the significance of his conduct." That statutory issue, however, is of no consequence on the second assignment of error, even if it were preserved, insofar as we have already determined, in the first assignment, that we need not reach that statutory issue on appeal.

We recognize here, as we did in *Colby*, that, in a bench trial, "there is no fixed procedural means of preserving a challenge to the trial court's determinations as to the elements of a crime, nor is the trial court required to express its ruling in a particular way." *Id.* at 251 (relying on *State v. Hull*, 286 Or 511, 517, 595 P2d 1240 (1979)). Yet, a request may be appropriate, even if made unconventionally, as when pointing out in a bench trial a dispute that is reflected in conflicting jury instructions before the court.

This case is distinguishable from *Colby*, and our explanation involves two ways of saying the same thing. First, defendant did not adequately preserve a request for a ruling on a disputed point of law, and, second, defendant did not say enough to trigger the trial court's duty to make a record sufficient to facilitate review of that disputed issue on appeal.

To preserve an error for appellate review, "a party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). "Rules of preservation are meant to ensure that the parties' positions are presented clearly to the trial court and that parties are not taken by surprise, misled, or denied opportunities to meet an argument." *State v. Berg*, 223 Or App 387, 395, 196 P3d 547 (2008), *rev den*, 346 Or 361 (2009).

After the trial court announced its verdicts on multiple counts, defendant asked whether "the [c]ourt made or is the [c]ourt intending to make findings of fact and conclusions of law?" Defendant did not refer the court to any prior document filed with the court, and defendant did not refer the court to any one of the many offenses charged, the GEI defense, a dispute about a combination of causes of incapacity, the appreciate-the-criminality form of incapacity, or any other legal issue in dispute in the case. The trial court responded that, "as the finder of fact *** [it] wouldn't normally do that in the entry of a verdict," and the court was never "asked for those in writing." Defendant then reiterated, "Well *** we would request that there be *** findings

of fact and conclusions of law." Although defendant repeated his generalized request, he still did not refer to any particular issue briefed or law in dispute. He did not call any particular matter to the court's attention.

A request for clarification of a disputed legal standard occurs where a party presents a legal question to the court by requesting that the trial court disclose the discrete elements of law on a matter in dispute and on which the trial court relies in making its ultimate conclusion. Although defendant assumes on appeal that he made a request that requires us to reverse the judgment, his generalized request, following a host of verdicts, that the court make "findings of fact and conclusions of law" did not sufficiently alert the trial court that defendant was requesting the court to state on the record, for the purposes of preservation and review, what view the trial court was taking on any particular disputed point of law. Defendant's request did not tell the court that there was a dispute of law to address or to resolve.

Even if criminal procedure mirrored civil procedure, such a general request for findings of fact and conclusions of law addresses the sweep of facts and issues across all counts in the case. The trial court's response, that the trial court "wouldn't normally do that in the entry of a verdict," reflects that the trial court understood defendant merely to be asking for findings of fact and conclusions of law similar to a party making such a request in a civil case pursuant to ORCP 62. The trial court was correct in that there is no criminal law equivalent to ORCP 62. Although, as we discussed in *Colby*, the trial court must clarify a disputed point of law when asked, the trial court must at least be alerted in some way that a party is requesting that it disclose specific legal principles squarely put at issue. Because the trial court was not alerted to the substance of any particular dispute about the elements of the GEI defense under ORS 161.295, the defendant's second assignment of error is unpreserved.

Put another way, defendant's generalized request did not "trigger" the trial court's obligation to address the elements of the GEI defense. *See Colby*, 295 Or App at 252 (discussing that a trial court's obligation to disclose its

understanding of the elements of a crime only occurs where a party has sufficiently "triggered the trial court's obligation"). Defendant made a request for "findings of fact and conclusions of law" that was untethered from any issue brought then to the attention of the court or memorandum or other document that he had previously filed. Accordingly, the trial court did not err in failing to elaborate on its murder verdict or to provide an exposition of the GEI defense.

## IV.   DEFENDANT'S SENTENCE

In his third assignment of error, defendant argues that the trial court erred in imposing a sentence of life, with no possibility of parole or release for 25 years, on defendant's merged convictions for murder. Defendant asserts that the sentence is disproportionate under Article I, section 16, of the Oregon Constitution.[9] Also, defendant contends that the trial court abused its discretion in deciding not to consider the extreme emotional disturbance defense (EED) in its proportionality analysis, which defendant presented for the first time in his sentencing memorandum. The state argues that defendant's sentence is proportional under the Oregon Constitution, and that the trial court did not err when it declined to consider the EED defense on the ground that defendant had not provided timely notice. We agree with the state in both respects.

### A.   *Proportionality*

Whether a sentence is constitutionally disproportionate under Article I, section 16, is a question of law. *State v. Ryan*, 361 Or 602, 614-15, 396 P3d 867 (2017). In conducting that review, we are bound by any findings of historical fact that the trial court may have made, if they are supported by evidence in the record. *Id.*

Article I, section 16, requires that "all penalties shall be proportioned to the offense." The driving principle for deciding whether a sentence is unconstitutional under

---

[9] Defendant also asserts that his sentence violates the Eighth Amendment to the United States Constitution, but he does not develop an argument that the sentence could violate the Eighth Amendment even if it is proportional under Article I, section 16. Accordingly, we do not further address the Eighth Amendment point.

Article I, section 16, is whether the length of the sentence would shock the moral sense of reasonable people. *Ryan*, 361 Or at 612. The legislature has primary authority to determine the appropriate length of punishment for a given crime, and only in rare instances when the legislature has exceeded its authority may a court conclude that a particular punishment is constitutionally disproportionate. *Id.* The Oregon Supreme Court has identified the following three factors for determining whether a sentence is constitutionally disproportionate to the offense, as applied to a particular defendant: "'(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant.'" *State v. Fudge*, 297 Or App 750, 756, 443 P3d 1176, *rev den*, 365 Or 819 (2019) (quoting *State v. Rodriguez/Buck*, 347 Or 46, 58, 217 P3d 659 (2009)).

Defendant raises arguments about each of the three *Rodriguez/Buck* factors. Under the first factor, we consider the gravity of the defendant's particular conduct, including consideration of how an offender's personal characteristics influence his conduct, and the gravity of the statutorily defined crime itself. *Rodriguez/Buck*, 347 Or at 62. In an as-applied challenge, a court may also consider case-specific circumstances, such as the characteristics of the defendant and the victim, the harm to the victim, and the relationship between the defendant and the victim. *Id.* The Oregon Supreme Court has concluded that, when considering a defendant's personal characteristics, a sentencing court must consider an offender's intellectual disability, including how the disability affects the offender's level of understanding of the nature and consequences of his conduct and his ability to conform his conduct to the law. *Ryan*, 361 Or at 621. In *Ryan*, the sentencing court committed reversible error where the record demonstrated that the sentencing court did not consider whether the defendant had an intellectual disability. *Id.* at 624-25.

Under the second factor, we compare the penalty imposed with penalties for other, related crimes. *Rodriguez/Buck*, 347 Or at 63. The focus of that inquiry is whether the penalties for more serious crimes result in less severe sentences. *Id.* Where substantially more egregious conduct

results in the same mandatory minimum sentence as a defendant's conduct, the court in *Rodriguez/Buck* reasoned that reasonable people would not believe the defendants' sentences were proportioned to the defendants' offenses in light of the other. *Id.* at 75-76.

Under the third factor, we determine whether the penalty imposed is proportional by examining a defendant's criminal history. *Id.* at 77. The inquiry is relevant under a failed deterrence rationale because a defendant who has previously been convicted of and served sentences for other crimes has demonstrated that the previously imposed sentences were insufficient to prevent the defendant from returning to criminal behavior. *Id.*

Here, as to the first factor, defendant argues that the record does not demonstrate that the trial court considered the implications of defendant's schizophrenia when determining proportionality. We disagree. As discussed in the first assignment of error, the bulk of defendant's trial consisted of various expert witnesses testifying as to defendant's mental illness. At the sentencing hearing itself, the trial court also heard, over objection, broad testimony about defendant's mental illness and its effect on defendant's mental state at the time of the murder. After the trial court heard that testimony, the trial court stated that it "believe[d] that, based on this defendant and the totality of his history, this crime[,] and the totality of the circumstances and this victim and the harm caused, that this is not the rare case where" the presumptive sentence is inappropriate. After imposing the presumptive sentence of life, with no possibility of release or parole for 25 years, the trial court stated that, "based on the testimony that I heard in the lengthy trial and the additional testimony today, I think I have a great insight into who you are and into your mental issues."

Given those statements, this case is distinguishable from the trial court's error in *Ryan*. There, the record contained no evidence at all that the court had considered the defendant's intellectual disability in the context of proportionality, because the court was unsure whether an offender's intellectual disability was an appropriate consideration. 361 Or at 624. Here, the sentencing court stated

that it had considered the "totality of the circumstances" after allowing lengthy testimony regarding how defendant's schizophrenia should affect the proportionality of his sentence, which the court stated gave it "great insight * * * into [defendant's] mental issues."

Defendant next argues that, even if the court properly considered his mental illness, his schizophrenia lessens the gravity of his conduct and makes the mandatory sentence too severe. We disagree with defendant that this instance of intentional murder was on the "lower end" of the range of conduct encompassed within the intentional-murder statute. Although no party disputed defendant's schizophrenia diagnosis, defendant's conviction for intentional murder, ORS 163.115, was based in part on the trial court's rejection of his GEI defense. An analysis of defendant's personal characteristics in this instance thus requires emphasis on the fact that defendant was convicted of murder based on his unexcused actions. Defendant was convicted of intentionally causing the gravest consequence of any crime—the unprovoked death of another human being. Defendant randomly targeted the victim based on the victim's perceived wealth and said that he chose to brutally attack the victim as a way to get back at society for his own "victimization." Defendant said that he continued to strike the victim with the machete until the victim no longer made any noise. Based on the facts supporting defendant's conviction for intentional murder, the gravity of defendant's conduct operates to justify a life sentence, with the possibility of parole after 25 years, under the first factor.

Turning to the second factor, the comparison of the penalty imposed with the penalties for more egregious crimes, defendant does not provide any examples of crimes more serious than intentional murder that result in the same sentence as defendant's offense. Given defendant's failure to provide any such examples, his arguments concerning the second factor are not persuasive.[10]

---

[10] Defendant uses the opportunity provided by the second factor to argue that the sentencing court should have accepted his extreme emotional disturbance (EED) defense and given him the mandatory sentence for first-degree manslaughter. We consider the EED defense in more detail below and here limit our inquiry to the specific purpose of the second factor.

As to the third factor, defendant does not dispute that he has a lengthy criminal record that includes violent assaults, burglaries, and domestic violence. Instead, defendant argues that any of his criminal history that took place after the appearance of the first signs of his schizophrenia in 2006 should be disregarded as irrelevant to a theory of deterrence under the third factor. Defendant argues that deterrence should be evaluated based on how likely defendant is to commit crimes in the future after receiving treatment for his mental illness. The state responds that there is nothing in the record to suggest that defendant's prior convictions were the result of any psychotic process and that the proper focus of a deterrence argument is on the failure of past deterrence efforts rather than the likely deterrent effect of future action. The state has the better argument.

Defendant's criminal record includes assaults, burglaries, and incidents of domestic violence that occurred before and after 2006—the year that psychiatrists testified that defendant's schizophrenic symptoms started to appear. During trial, Dr. Choi testified that, based on the reports of those crimes and his own discussions with defendant, there was no appearance in the record that defendant had a delusional basis or construct at the time that he committed those crimes. Given that record, there is no evidence to support defendant's assertion that his criminal record is a result of his mental illness, nor does defendant provide support for his argument that it would not be appropriate to consider his criminal history if such evidence did exist. The argument that defendant is unlikely to commit crimes in the future also does not address the primary concern of the third factor—that defendant engaged in the conduct at issue despite past efforts at reform. Under the third factor, therefore, this is not an instance where the imposed sentence is disproportionate based on defendant's criminal history.

All in all, this is not the rare case in which the penalty imposed violates Article I, section 16. The sentence that the trial court imposed under ORS 163.115(5)(b)—defendant's sentence of life imprisonment with the possibility of parole after 25 years—is not unconstitutionally disproportionate.

B.  *Extreme Emotional Disturbance Defense*

In addition to challenging the proportionality of his sentence, defendant argues that the trial court erred in declining, due to a lack of proper notice, to consider his EED defense, which was presented for the first time in his sentencing memorandum. We review the trial court's decision not to consider a belated EED defense for abuse of discretion. *See State v. Pennington*, 28 Or App 331, 337, 559 P2d 915, *rev den*, 278 Or 393 (1977).

On appeal, defendant acknowledges that he did not provide timely notice of his EED defense. Defendant, however, argues that "just cause" existed for his failure to provide notice of an EED defense prior to asserting the defense in his sentencing memorandum. Defendant contends that, because he was charged with aggravated murder, to which EED is not a defense, defendant did not anticipate that the trial court would find him guilty of the lesser-included offense of intentional murder and therefore did not prepare an EED defense prior to trial. The state responds that the court did not abuse its discretion in rejecting the defendant's EED defense based on its untimeliness and further argues that, based on the merits, the EED defense does not apply in this case. We agree with the state that the trial court did not abuse its discretion when it declined to consider the EED defense and therefore do not reach the merits of defendant's EED argument.

Pursuant to ORS 163.115(1)(a), EED can be presented as an affirmative defense to murder. A defendant, however, must provide pretrial notice of his intention to present the EED defense unless the "court determines that there was just cause for failure to file notice at the time of defendant's plea." ORS 163.135(3) (2011).

Defendant is correct that he was charged with aggravated murder. Aggravated murder may be defined as a murder that is committed intentionally, plus something more. *State v. Wille*, 317 Or 487, 494, 858 P2d 128 (1993). Intentional murder necessarily is a lesser-included offense of aggravated murder. *Id.* at 494-95. Defendant is also correct that EED is a defense to intentional murder.

*Id.* at 494. The defense of EED remains available as a defense to murder even where the charge is before the factfinder as a lesser-included offense, rather than as a separately charged crime, and even though EED is not a defense to aggravated murder. *Id.* at 494-95.

The accusatory instrument charged in six counts that defendant "personally and intentionally caused the death of" the victim, "a human being who was not a participant in the crime." That language encompasses the crime of "homicide *** committed intentionally," for which defendant was ultimately convicted under ORS 163.115(1)(a). There was evidence from which a rational factfinder could determine that defendant was not guilty of aggravated murder but was guilty of intentional murder. As a consequence, defendant had sufficient notice that the court could find him guilty of the lesser-included offense of intentional murder. Defendant had the opportunity to prepare the associated defense of EED before trial. Accordingly, the trial court did not abuse its discretion when it declined to consider the defendant's belated EED defense.

## V.   SUFFICIENCY OF THE INDICTMENT

In his fourth assignment, defendant argues that the trial court erred when it denied his motion in arrest of judgment, contending that the indictment failed to state sufficient facts to allege the crime of first-degree robbery. Generally, we review a defendant's claim that the indictment failed to state the crime of first-degree robbery for errors of law. *State v. Stout*, 281 Or App 263, 266, 382 P3d 591 (2016), *aff'd*, 362 Or 758, 415 P3d 567 (2018).

Defendant argues that the language used in the indictment, charging him with two counts of first-degree robbery, ORS 164.415, did not sufficiently allege that he had armed himself with a "deadly weapon," "use[d] or attempt[ed] to use a dangerous weapon," or "caused or attempted to cause serious physical injury to any person." Defendant urges that we vacate his GEI convictions for first-degree robbery and remand with instructions to enter GEI convictions on third-degree robbery on those counts. The state argues that, because defendant did not file his motion in arrest of

judgment until after the verdict had been announced, the sufficiency of the indictment only fails if it does not state any crime at all. The state argues that the indictment meets that relaxed standard.

An indictment should be crafted with "sufficient particularity and certainty *** in a matter of substance, to enable the defendant to prepare for his defense and to plead his acquittal or conviction successfully, should he be again indicted for the same offense." *State of Oregon v. Monk*, 193 Or 450, 454-55, 238 P2d 1110 (1951). Although an indictment is sufficient if it tracks the language of the relevant statute, an indictment does not need to strictly use the language of the statute, and other words conveying the same meaning may be used. ORS 132.540(4). A defendant may demur to the accusatory instrument or raise a motion in arrest of judgment to raise a claim that "the facts stated do not constitute an offense." ORS 135.630(4); *State v. Hankins*, 342 Or 258, 265, 151 P3d 149 (2007). An indictment fails to state facts constituting an offense under ORS 135.630(4) when it fails to allege each of the essential elements of the offense. *State v. Wimber*, 315 Or 103, 109, 843 P2d 424 (1992).

When a defendant timely challenges an indictment by demurrer, the indictment is construed strictly against the state. *Monk*, 193 Or at 457. A court, however, does not look with favor where an indictment is not challenged by demurrer but raised for the first time later as a delayed attack. *Id.* at 456-57. If the sufficiency of an indictment is challenged after the verdict, the language of the indictment is held to a less exacting standard and is given a "more liberal construction." *Id.* at 457.

In this case, defendant did not challenge the sufficiency of the indictment until after the verdict, which entitles the language of the indictment to the "liberal construction" explained in *Monk*. Nevertheless, defendant argues that the state's use of the phrase "dangerous weapon" rather than "deadly weapon" and absence of the specific phrase "caused or attempted to cause serious physical injury to any person" are fatal to the indictment. We disagree and conclude that, after trial, the language of the indictment was sufficient to identify the specific offense and facts at issue and to inform

defendant of the specific offense for which he was charged. *See State v. Pachmayr*, 344 Or 482, 490, 185 P3d 1103 (2008) (stating such outcomes as the constitutional purpose of an indictment).

A person commits first-degree robbery if the person violates ORS 164.395 and the person is "(a) armed with a deadly weapon; (b) [u]ses or attempts to use a dangerous weapon; or (c) [c]auses or attempts to cause serious physical injury to any person." ORS 164.415. Count 7 of defendant's indictment charged defendant with first-degree robbery and alleged:

> "The defendant, on or about September 17, 2012, in Clackamas County, Oregon, did unlawfully and knowingly, while in the course of attempting to commit theft, with the intent of preventing and overcoming resistance to defendant's taking of property and retention of the property immediately after the taking, and being armed with a dangerous weapon, threaten the immediate use of physical force upon [FH]."

Count 8 of defendant's indictment also charged defendant with first-degree robbery and alleged:

> "The defendant, on or about September 17, 2012, in Clackamas County, Oregon, did unlawfully and knowingly, while in the course of attempting to commit theft, with the intent of preventing and overcoming resistance to defendant's taking of property and retention of the property immediately after the taking, and being armed with a dangerous weapon, use or threaten the immediate use of physical force upon [MH]."

The charges were less than perfect. They state that defendant was "armed with a *dangerous* weapon" (rather than armed with a *deadly* weapon; or, rather than *used or attempted to use* a dangerous weapon), and they state that defendant "threaten[ed] the immediate use of physical force" upon FH and MH, respectively (rather than uses or attempts to use a dangerous weapon or rather than causes or attempts to cause serious physical injury).

Nevertheless, in light of the liberal construction to which the indictment is entitled after trial, the phrases in the indictment may be read together to provide the

necessary notice of the charges. The phrases may be fairly understood to charge that, because he had used or threatened the immediate use of physical force while armed with a dangerous weapon, defendant had used or threatened to use a dangerous weapon. The language of the indictment was sufficient to inform defendant of the specific offenses and facts that would be at issue. The indictment plainly referred to the events of September 17, 2012.

The record reflects that defendant was fully aware of the events to which the indictment referred. The trial evidence indicates that, when defendant was in the couple's home, he was armed with a machete and a knife, both of which satisfy the "deadly weapon" element of first-degree robbery. The evidence at trial is considered when evaluating the sufficiency of the indictment. *See Monk*, 193 Or at 457 (indictment was not "fatally defective" where it failed to allege facts satisfying the element that an organization was a corporation where evidence at trial was then offered and admitted which proved that fact). Some time ago, the court explained:

> "Though the indictment is defective in the respects noted, nevertheless, it is not fatally defective. It is merely a defective statement of the offense charged. *The defect was cured by the verdict*. In 42 C.J.S., Indictments and Informations, § 319, page 1348, appears the following: '*** After verdict, it is only a failure to allege, even imperfectly, any crime known to the law that can be raised. It has been variously stated that an indictment or information will not be held [invalid] after verdict unless it fails in some essential averment necessary in the description of the crime, or unless the indictment is void, charges no offense, and is wholly insufficient to intercept the running of the statute of limitations ***.'"

*Monk*, 193 Or at 457 (emphasis added). The indictment, aided by trial evidence, adequately served to charge defendant with first-degree robbery. The trial court did not err in denying defendant's motion in arrest of judgment.

## VI.   CONCLUSION

In sum, the evidence permitted the factfinder to reject defendant's GEI defense as to the lesser-included

murder charge. Defendant failed to make an appropriate request at trial so as to challenge on appeal the trial court's failure to elaborate on the murder verdict or any legal dispute about the GEI defense. Defendant's life sentence is not constitutionally disproportionate. The indictment, aided by trial evidence, was sufficient to allege first-degree robbery. Therefore, the trial court did not err in rendering its judgment.

Affirmed.